Vacated by Supreme Court, April 26, 2004

**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

NORTH CAROLINA RIGHT TO LIFE,
INCORPORATED; NORTH CAROLINA
RIGHT TO LIFE POLITICAL ACTION
COMMITTEE; NORTH CAROLINA
RIGHT TO LIFE COMMITTEE FUND FOR
INDEPENDENT POLITICAL
EXPENDITURES,

          *Plaintiffs-Appellees,*

      v.

LARRY LEAKE, in his official
capacity as Chairman of the North
Carolina State Board of Elections;
GENEVIEVE C. SIMS, in her official
capacity as Secretary of the State
Board of Elections; ROBERT CORDLE,
in his official capacity as a member
of the State Board of Elections;
LORRAINE G. SHINN, in her official
capacity as a member of the State
Board of Elections; CHARLES
WINFREE, in his official capacity as
a member of the State Board of
Elections; ROBERT F. JOHNSON, in his
official capacity as District Attorney
for the North Carolina Prosecutorial
District 15A; ROY COOPER, in his
official capacity as the North
Carolina Attorney General,

          *Defendants-Appellants.*

No. 02-2052

NORTH CAROLINA RIGHT TO LIFE,
INCORPORATED; NORTH CAROLINA
RIGHT TO LIFE POLITICAL ACTION
COMMITTEE; NORTH CAROLINA
RIGHT TO LIFE COMMITTEE FUND FOR
INDEPENDENT POLITICAL
EXPENDITURES,
                    *Plaintiffs-Appellants,*

                    v.

LARRY LEAKE, in his official
capacity as Chairman of the North
Carolina State Board of Elections;
GENEVIEVE C. SIMS, in her official
capacity as Secretary of the State
Board of Elections; ROBERT CORDLE,            No. 02-2053
in his official capacity as a member
of the State Board of Elections;
LORRAINE G. SHINN, in her official
capacity as a member of the State
Board of Elections; CHARLES
WINFREE, in his official capacity as
a member of the State Board of
Elections; ROBERT F. JOHNSON, in his
official capacity as District Attorney
for the North Carolina Prosecutorial
District 15A; ROY COOPER, in his
official capacity as the North
Carolina Attorney General,
                    *Defendants-Appellees.*

Appeals from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Terrence W. Boyle, Chief District Judge.
(CA-99-798-5-BO)

Argued: May 6, 2003

Decided: September 23, 2003

Before WIDENER and MICHAEL, Circuit Judges, and
Frank W. BULLOCK, Jr., United States District Judge
for the Middle District of North Carolina,
sitting by designation.

---

Affirmed in part and reversed in part by published opinion. Judge
Bullock wrote the opinion, in which Judge Widener joined. Judge
Michael wrote an opinion concurring in part and dissenting in part.

---

## COUNSEL

**ARGUED:** Alexander McClure Peters, Special Deputy Attorney
General, NORTH CAROLINA DEPARTMENT OF JUSTICE,
Raleigh, North Carolina, for Appellants. James Bopp, Jr., BOPP,
COLESON & BOSTROM, Terre Haute, Indiana, for Appellees. **ON
BRIEF:** Roy Cooper, North Carolina Attorney General, Susan K.
Nichols, Special Deputy Attorney General, NORTH CAROLINA
DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appel-
lants. Eric C. Bohnet, BOPP, COLESON & BOSTROM, Terre Haute,
Indiana, for Appellees.

---

## OPINION

BULLOCK, District Judge:

Appellees North Carolina Right to Life, Inc. ("NCRL"), North Car-
olina Right to Life Political Action Committee ("NCRLPAC"), and
North Carolina Right to Life Committee Fund for Independent Politi-
cal Expenditures ("NCRLC-FIPE") filed suit in federal court chal-
lenging the constitutionality of certain provisions of North Carolina's
election and campaign finance laws. In a mixed result for both sides,

the district court declared certain of the challenged provisions unconstitutional and permanently enjoined the State of North Carolina from enforcing those provisions. Both sides now appeal. For the reasons that follow, we affirm in part and reverse in part.

I.

NCRL is a non-profit, membership corporation, incorporated in North Carolina, with local chapters throughout the State. According to NCRL, its major purpose is not the nomination or election of candidates, but rather to educate North Carolinians regarding pro-life issues. NCRLPAC is an internal political committee established by NCRL to engage in express advocacy consistent with the views of NCRL. NCRLPAC's primary purpose is to support or oppose specific candidates and political parties. NCRLC-FIPE is also an internal political action committee created by NCRL. Its sole purpose is to make independent expenditures and it may not make monetary or in-kind contributions to candidates.

This action is the sequel to litigation that was commenced in 1996, in which NCRL successfully challenged certain provisions of the North Carolina campaign finance laws. *See North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705 (4th Cir. 1999) ("*NCRL I*"). Responding to this court's decision, the North Carolina General Assembly adopted legislation that amended, deleted, and added campaign finance statutes. Following these legislative changes, NCRL filed this suit again challenging as facially unconstitutional certain provisions of these statutes.

First, NCRL challenged the provision setting forth the method for determining whether a communication supports or opposes the nomination or election of a particular candidate. N.C. Gen. Stat. § 163-278.14A(a)(2) (2001). NCRL argued that the statute unconstitutionally regulates issue advocacy. Second, NCRL challenged North Carolina's definition of political committee on the ground that it unconstitutionally presumes that an entity has as a major purpose to support or oppose a candidate when an entity contributes or expends more than $3,000.00 during an election cycle. *Id.* § 163-278.6(14). Third, NCRL challenged the $4,000.00 contribution limit to independent expenditure political action committees on the ground that such

contributions do not present the risk of *quid pro quo* corruption or its appearance. *Id.* § 163-278.13. Fourth, NCRL challenged the provision requiring that entities making expenditures on printed material or advertisements that name candidates to report such expenditures. *Id.* § 163-278.12A. Finally, NCRL challenged the requirement that a sponsor must provide a disclaimer of support or opposition for a candidate in its advertisements. *Id.* § 163-278.39(a)(3).

NCRL and the State filed cross motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. On October 24, 2001, the district court granted summary judgment for NCRL on two of the three primary statutory provisions at issue and enjoined their enforcement. As to Section 163-278.14A(a)(2), the district court held that the provision impermissibly broadened the scope of "express advocacy" as defined by the Supreme Court in *Buckley v. Valeo*, 424 U.S. 1 (1976). Section 163-278.14A(a)(2), according to the district court, is unconstitutional because it "does not limit the scope of 'express advocacy' to communications that literally include words that, in and of themselves, advocate the election or defeat of a candidate, as was required in *Buckley*." (J.A. at 183-84.) With regard to Section 163-278.6(14), which incorporates Section 163-278.14A, the district court held in an amended order that it could be read constitutionally provided Section 163-278.14A(a)(2) was severed from the rest of the section. The district court rejected NCRL's position that Section 163-278.6(14)'s presumption of political committee status based on an entity's expenditures violated the First Amendment. With regard to Section 163-278.13, the district court held that a limit on contributions to political committees that engage solely in making independent expenditures was unconstitutional. Finally, the district court held that NCRL's challenge to Sections 163-278.12A and 163-278.39(a)(3) was moot.

Both parties now appeal. The State appeals on the grounds that the district court erred in declaring Sections 163-278.14A(a)(2) and 163-278.13 unconstitutional. NCRL appeals claiming that the district court erred in dismissing its challenge to Section 163-278.6(14)'s major purpose presumption. NCRL also assigns as error the district court's determination that its challenge to Section 163-278.12A was moot.

## II.

Before addressing the merits of the parties' contentions, an understanding of the statutory provisions at issue is necessary. Under Section 163-278.6(14), a "political committee" is defined to mean:

a combination of two or more individuals, such as any person, committee, association, organization, or other entity that makes, or accepts anything of value to make, contributions or expenditures and has one or more of the following characteristics:

a.   Is controlled by a candidate;

b.   Is a political party or executive committee of a political party or is controlled by a political party or executive committee of a political party;

c.   Is created by a corporation, business entity, insurance company, labor union, or professional association pursuant to G.S. 163-278.19(b); or

d.   Has as a major purpose to support or oppose the nomination or election of one or more clearly identified candidates.

. . .

An entity is rebuttably presumed to have as a major purpose to support or oppose the nomination or election of one or more clearly identified candidates if it contributes or expends or both contributes and expends during an election cycle more than three thousand dollars ($3,000). The presumption may be rebutted by showing that the contributions and expenditures giving rise to the presumption were not a major part of activities of the organization during the election cycle . . . .

N.C. Gen. Stat. § 163-278.6(14) (2001). Accordingly, to be regarded as a political committee, and therefore be subject to the regulations

attendant to that status, requires that an entity (1) make contributions or expenditures and (2) have one or more of the enumerated characteristics.

An expenditure, and similarly a contribution, is defined as "any purchase, advance, conveyance, deposit, distribution, transfer of funds, loan, payment, gift, pledge or subscription of money or anything of value whatsoever, . . . to support or oppose the nomination [or] election . . . of one or more clearly identified candidates." *Id.* § 163-278.6(9); *see also id.* § 163-278.6(6) (similarly defining the term "contribution"). To determine whether a purchase or advance is made to "support or oppose" a candidate, and thus be considered an expenditure, an "express advocacy" test is employed. Section 163-278.14A, which sets forth the two alternative prongs of the express advocacy test, provides:

(a)   Either of the following shall be means, but not necessarily the exclusive or conclusive means, of proving that an individual or other entity acted "to support or oppose the nomination or election of one or more clearly identified candidates":

(1)   Evidence of financial sponsorship of communications to the general public that use phrases such as "vote for", "reelect", "support", "cast your ballot for", "(name of candidate) for (name of office)", "(name of candidate) in (year)", "vote against", "defeat", "reject", "vote pro-(policy position)" or "vote anti-(policy position)" accompanied by a list of candidates clearly labeled "pro-(policy position)" or "anti-(policy position)", or communications of campaign words or slogans, such as posters, bumper stickers, advertisements, etc., which say "(name of candidate)'s the One", "(name of candidate) '98", "(name of candidate)!", or the names of two candidates joined by a hyphen or slash.

(2)   Evidence of financial sponsorship of communications whose essential nature expresses

electoral advocacy to the general public and goes beyond a mere discussion of public issues in that they direct voters to take some action to nominate, elect, or defeat a candidate in an election. If the course of action is unclear, contextual factors such as the language of the communication as a whole, the timing of the communication in relation to events of the day, the distribution of the communication to a significant number of registered voters for that candidate's election, and the cost of the communication may be considered in determining whether the action urged could only be interpreted by a reasonable person as advocating the nomination, election, or defeat of that candidate in that election.

*Id.* § 163-278.14A(a). If a communication supports or opposes a particular candidate, as determined by application of the two methods described above, an entity's financial sponsorship of that communication will be deemed an expenditure, and thus satisfy the first requirement of the political committee definition.

The second requirement for designation as a political committee, in addition to the contribution and expenditure requirement, is that an entity qualify as one of the following: (1) a candidate-controlled organization; (2) a political party; (3) an organization created by a corporation, business entity, insurance company, labor union, or professional association; or (4) an organization that "[h]as as a major purpose to support or oppose the nomination or election of one or more clearly identified candidates." *Id.* § 163-278.6(14). For purposes of this appeal, only the "major purpose" characteristic is at issue. North Carolina's "major purpose" test provides that if an entity makes more than $3,000.00 in contributions and/or expenditures during an election cycle, it is presumed to have as a "major purpose" the election or defeat of a candidate. *Id.* An entity may rebut the presumption by "showing that the contributions and expenditures giving rise to the presumption were not a major part of activities of the organization during the election cycle." *Id.* Ultimately, however, the State bears the

burden of proving that an entity's major purpose is to support or oppose a particular candidate. *Id.* § 163-278.34A.[1]

As a consequence of being regarded by the State as a political committee, an entity is subject to administrative and regulatory requirements. A political committee is required to appoint a treasurer, file a statement of organization, maintain detailed accounts of all contributions received and expenditures made, and file periodic statements with the State Board of Elections. *Id.* §§ 163-278.7, .8, .9, .11. If an entity fails to comply with these requirements, it may be subject to prosecution for a class 2 misdemeanor, as well as civil late-filing fines. *Id.* §§ 163-278.27, .34.

In addition to the provisions relating to the definition of political committee, NCRL challenged Section 163-278.13, which defines the limits on contributions an individual or entity can make. Section 163-278.13 provides in part: "No individual, political committee, or other entity shall contribute to any candidate or other political committee any money or make any other contribution in any election in excess of four thousand dollars ($4,000) for that election." *Id.* § 163-278.13(a). This contribution limit applies equally to contributions made to "independent expenditure political committees", *i.e.*, political committees that make only independent expenditures. An independent expenditure, in turn, is defined to mean "an expenditure to support or oppose the nomination or election of one or more clearly identified candidates that is made without consultation or coordination with a candidate or agent of a candidate." *Id.* § 163-278.6(9a).

The final statutory provisions challenged merit no discussion of their terms. We have already declared Section 163-278.12A unconstitutional in *Perry v. Bartlett*, 231 F.3d 155 (4th Cir. 2000), and Section 163-278.39(a)(3) was repealed by the General Assembly effective August 10, 2001.

---

[1]Section 163-278.34A provides: "In any proceeding brought pursuant to this Article in which a presumption arises from the proof of certain facts, the defendant may offer some evidence to rebut the presumption, but the State bears the ultimate burden of proving the essential elements of its case."

We now turn to the merits which we review under the "exacting scrutiny applicable to limitations on core First Amendment rights of political expression." *Buckley v. Valeo*, 424 U.S. 1, 44-45 (1976); *FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 252 (1986) ("*MCFL*") (stating that a statutory provision that burdens political speech must be justified by a compelling state interest).

### III.

The Supreme Court adopted in *Buckley* a bright-line test for determining whether communications may constitutionally be regulated as electoral advocacy. Under the Court's "express advocacy" test, only expenditures for "communications that include explicit words of advocacy of election or defeat of a candidate" are subject to regulation. *Buckley*, 424 U.S. at 43. The rationale for the Court's bright-line rule was that "the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application. Candidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions." *Id.* at 42. Accordingly, the Court "refused to adopt a standard allowing regulation of any advertisement that mentions a candidate's stand on an issue." *Perry*, 231 F.3d at 160 (citing *Buckley*, 424 U.S. at 42-43). The Court provided, in a now famous footnote, a list of illustrative words and phrases that qualify as "express words of advocacy." *Buckley*, 424 U.S. at 44 n.52.

The first prong of North Carolina's "express advocacy" test mirrors the "express advocacy" test adopted in *Buckley* and reaffirmed in *MCFL*. Section 163-278.14A(a)(1) provides that an entity acts to support or oppose a particular candidate when it uses words or phrases such as "vote for", "reelect", "support", "defeat", "reject", "vote pro-(policy position)" accompanied by a list of candidates clearly labeled "pro-(policy position)", etc. N.C. Gen. Stat. § 163-278.14A(a)(1) (2001). NCRL does not challenge the validity of this provision. Rather, its challenge is directed to the second prong of North Carolina's express advocacy test.

If an entity does not satisfy the first prong of the North Carolina express advocacy test, the second prong, or "context prong," provides an additional means of determining whether an entity acts to support

or oppose a candidate. Under the context prong, the following is a means of proving that an entity acted to support or oppose a candidate:

> Evidence of financial sponsorship of communications whose essential nature expresses electoral advocacy to the general public and goes beyond a mere discussion of public issues in that they direct voters to take some action to nominate, elect, or defeat a candidate in an election. If the course of action is unclear, contextual factors such as the language of the communication as a whole, the timing of the communication in relation to events of the day, the distribution of the communication to a significant number of registered voters for that candidate's election, and the cost of the communication may be considered in determining whether the action urged could only be interpreted by a reasonable person as advocating the nomination, election, or defeat of that candidate in that election.

*Id.* § 163-278.14A(a)(2).

The district court held that the context prong of Section 163-278.14A impermissibly regulates issue advocacy. This test, the district court held, violates the express advocacy test adopted by the Supreme Court in that it "does not limit the scope of 'express advocacy' to include only 'clear words that "directly fit the term ['express advocacy'],"'" but instead allows consideration of various contextual factors. (J.A. at 186.) We agree, and thus Section 163-278.14A(a)(2) is unconstitutionally vague and overbroad.[2]

---

[2]Our dissenting colleague would uphold the first sentence of Section 163-278.14A(a)(2) as focusing only on express advocacy and faithful to the Supreme Court's analysis in *MCFL*. The dissent correctly notes that the Court in *MCFL* looked to the "essential nature" of the communication in determining whether it communicated electoral advocacy of a particular candidate. Yet while the Court considered the communication's essential nature, the focus of the Court's inquiry, as dictated by *Buckley*, remained on the actual words of advocacy. No such limitation is provided for under the "essential nature" standard of the first sentence. This circuit, however, has consistently interpreted *Buckley* as allowing regula-

The ability to consider a communication's context, the State contends, was expressly approved by this court in *FEC v. Christian Action Network, Inc.*, 110 F.3d 1049, 1052-55 (4th Cir. 1997) ("*CAN II*"). In *CAN II*, we cited the Ninth Circuit decision in *FEC v. Furgatch*, 807 F.2d 857 (9th Cir. 1987), summarizing its holding as permitting, in those instances where political communications do include an explicit directive to voters to take some course of action but that course of action is unclear, consideration of "context" in determining whether the action urged is the election or defeat of a particular candidate. *CAN II*, 110 F.3d at 1054. The State's reliance on our acknowledgment of *Furgatch*, however, is misplaced.

Our statement in *CAN II* regarding the Ninth Circuit's express advocacy test was not a statement of the law in this circuit. The court in *CAN II* was not tasked with determining the constitutionality of a particular regulation; that determination had already been made in an earlier decision. *FEC v. Christian Action Network*, 894 F. Supp. 946 (W.D. Va. 1995), *aff'd*, 92 F.3d 1178, 1996 WL 431996 (4th Cir. 1996) (per curiam) (adopting district court opinion). Instead, the issue before the court was whether the FEC's litigation position in the earlier decision lacked substantial justification, and if so whether it was liable for attorney's fees under the Equal Access to Justice Act. *CAN II*, 110 F.3d at 1050. Consequently, this court analyzed *Furgatch* as the broadest judicial description of the *Buckley* express advocacy test in order to determine whether the FEC was justified in arguing that "*no* words of advocacy are necessary to expressly advocate the election of a candidate." *Id.* at 1064. Therefore, as a pronouncement of this circuit's express advocacy test, *CAN II*'s reference to the *Furgatch* holding is not applicable.

---

tion "only if it [is] limited to expenditures for communications that literally include *words which in and of themselves* advocate the election or defeat of a candidate." *Virginia Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 391 (4th Cir. 2001) (quoting *FEC v. Christian Action Network, Inc.*, 110 F.3d 1049, 1051 (4th Cir. 1997)). We believe, therefore, that the first sentence of Section 163-278.14A(a)(2) impermissibly dilutes the *Buckley* standard by allowing regulation of communications which do not contain explicit words of advocacy.

Furthermore, the holding in *Furgatch* is contrary to the precedent of this court. This circuit, along with many of our sister circuits, has rejected the expanded view of express advocacy adopted by the Ninth Circuit. *See*, *e.g.*, *Chamber of Commerce of the United States v. Moore*, 288 F.3d 187, 194 (5th Cir. 2002); *Virginia Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 391 (4th Cir. 2001) ("*VSHL II*"); *Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1174, 1187 (10th Cir. 2000); *Vermont Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 386-87 (2d Cir. 2000); *Iowa Right to Life Comm., Inc. v. Williams*, 187 F.3d 963, 969-70 (8th Cir. 1999); *Faucher v. FEC*, 928 F.2d 468, 471 (1st Cir. 1991). Admittedly, the Ninth Circuit's test does not stray far from other articulations of the express advocacy standard. The primary focus of the Ninth Circuit's standard is on the words themselves and in this regard it is consistent with our view of express advocacy. *Furgatch*, 807 F.2d at 864. The Ninth Circuit's view of express advocacy, however, is inconsistent with our view to the extent that it permits consideration of the communication's context in determining whether a communication advocates the election or defeat of a particular candidate for public office. *Id.* at 863-64 ("We conclude that context is relevant to a determination of express advocacy. A consideration of the context in which speech is uttered may clarify ideas that are not perfectly articulated, or supply necessary premises that are unexpressed but widely understood by readers or viewers."). In this regard, the Ninth Circuit's formulation of the express advocacy standard is broader than the bright-line rule adopted in this circuit and we reject it as insufficiently protective of the First Amendment.

This court has "steadfastly adhered to the bright-line 'express advocacy' test from *Buckley*," *Perry*, 231 F.3d at 160, and has ruled repeatedly that communications cannot be subject to campaign finance restrictions unless they use "explicit words of candidate advocacy." *CAN II*, 110 F.3d at 1051. We have described this circuit's reading of the express advocacy limitation of *Buckley* and *MCFL* as narrow and strict and limited to "'communications that literally include *words which in and of themselves* advocate the election or defeat of a candidate.'" *VSHL II*, 263 F.3d at 391 (quoting *CAN II*, 110 F.3d at 1051). To be faithful to the bright-line standard articulated by the Supreme Court, any inquiry into whether a communica-

tion supports or opposes the election of a particular candidate must focus only on the actual words of advocacy.

The State argues that limiting the definition of express advocacy to include speech that includes only "magic words" such as those described in *Buckley*'s famous footnote 52 misinterprets the meaning and intent of *Buckley*. To the contrary, this was exactly the meaning and intent of the *Buckley* Court.

> The Court opted for the clear, categorical limitation, that only expenditures for communications using explicit words of candidate advocacy are prohibited, so that citizen participants in the political processes would not have their core First Amendment rights to political speech burdened by apprehensions that their advocacy of issues might later be interpreted by the government as, instead, advocacy of election results.

*CAN II*, 110 F.3d at 1051. The Supreme Court recognized that application of a bright-line approach would "undoubtedly allow[ ] individuals and organizations to circumvent electoral regulations simply by omitting from their communications the genre of words and phrases that convey the same meaning as the words listed in *Buckley*." *Chamber of Commerce*, 288 F.3d at 195; *Furgatch*, 807 F.2d at 863. An unequivocal bright-line standard, the *Buckley* Court acknowledged, will "undermine[ ] [any] limitation's effectiveness as a loophole-closing provision by facilitating circumvention by those seeking to exert improper influence upon a candidate or officeholder." *Buckley*, 424 U.S. at 45. Such an approach was nevertheless adopted because "absent the bright-line limitation, the distinction between issue discussion (in the context of electoral politics) and candidate advocacy would be sufficiently *in*distinct that the right of citizens to engage in the vigorous discussion of issues of public interest without fear of official reprisal would be intolerably chilled." *CAN II*, 110 F.3d at 1051. Thus, while certain entities may be able to skirt just outside of the law's coverage, such a result has already been considered in the Supreme Court's calculus and the Court decided to draw a bright line that would "err on the side of permitting things that affect the election process, but at all costs avoids restricting, in any way, discussion of

public issues." *VSHL II*, 263 F.3d at 392 (quoting *Maine Right to Life Comm., Inc. v. FEC*, 914 F. Supp. 8, 12 (D. Me. 1996)).

The context prong of North Carolina's express advocacy test extends the bright-line rule of *Buckley* and this court beyond a strict and limited analysis of the actual words. Consideration of contextual factors such as "the timing of the communication in relation to events of the day, the distribution of the communication to a significant number of registered voters for that candidate's election, and the cost of the communication" bear no relation to the words themselves. N.C. Gen. Stat. § 163-278.14A(a)(2) (2001). Furthermore, the context prong evaluates communications based upon how they would be interpreted by "a reasonable person." *Id.* This inquiry "shifts the focus of the express advocacy determination away from the words themselves to the overall impression of the hypothetical, reasonable listener or viewer," which is precisely what *Buckley* and its progeny were designed to prohibit. *VSHL II*, 263 F.3d at 391-92. In no event can the distinction between "express advocacy" and "issue advocacy" depend on the understanding of the audience.

> "[W]hether words intended and designed to fall short of invitation would miss that mark is a question both of intent and of effect. No speaker, in such circumstances, safely could assume that anything he might say upon the general subject would not be understood by some as an invitation. In short, the supposedly clear-cut distinction between discussion, laudation, general advocacy, and solicitation puts the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning.
>
> Such a distinction offers no security for free discussion. In these conditions it blankets with uncertainty whatever may be said. It compels the speaker to hedge and trim."

*Buckley*, 424 U.S. at 43 (quoting *Thomas v. Collins*, 323 U.S. 516, 535 (1945)).

"Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government

established by our Constitution." *Id.* at 14. The "unfettered inter-change of ideas" guaranteed by the First Amendment would be chilled by a regulatory scheme that allowed consideration of anything other than the actual words of advocacy. Because the context prong of the North Carolina express advocacy test permits consideration of a communication's context and a reasonable person's interpretation, it unconstitutionally "shifts the determination of what is 'express advocacy' away from the words 'in and of themselves' to 'the unpre-dictability of audience interpretation.'" *VSHL II*, 263 F.3d at 392 (quoting *CAN II*, 110 F.3d at 1051, 1057).

The State argues that, even if the context prong impermissibly extends the express advocacy test declared in *Buckley*, the district court erred by failing to apply a limiting construction. It is well-settled that a federal court must uphold a statute if it is "'readily sus-ceptible' to a narrowing construction that would make it constitu-tional . . . . The key to application of this principle is that the statute must be 'readily susceptible' to the limitation; we will not rewrite a state law to conform it to constitutional requirements." *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988). The State proposes that a limiting construction might be that the context prong can be applied only to communications with explicit, verbal directives to voters to take some electoral action and the context fac-tors can be utilized only when the directive to take action is unambig-uous but the specific action urged is not clear. It is difficult to discern how this proposed instruction is materially different from what is already provided for in the statute. Reference to criteria outside of the actual words would still be required. Furthermore, this limiting con-struction does not remove the vagaries inherent in a test dependent on the understanding of the reasonable person under the circumstances. Accordingly, the district did not err in failing to apply a limiting con-struction.

## IV.

As set forth in Section II, *supra*, to be regarded as a political com-mittee requires that an entity (1) make contributions or expenditures and (2) have one or more enumerated characteristics. Among the enu-merated characteristics is the requirement that an entity "[have] as a major purpose to support or oppose the nomination or election of one

or more clearly identified candidates." N.C. Gen. Stat. § 163-278.6(14)(d) (2001). An entity is presumed to have as a major purpose to support or oppose a candidate if it contributes and/or expends more than $3,000.00 during an election cycle. *Id.* This presumption may be rebutted by showing that the "contributions and expenditures giving rise to the presumption were not a major part of activities of the organization during the election cycle." *Id.*

NCRL challenged the rebuttable presumption created in the statute arguing that it was both vague and overbroad. The district court rejected NCRL's arguments, holding that the presumption was not violative of the First Amendment. While a close question, we disagree with the district court.

The genesis of the Supreme Court's major purpose test stems from the Court's effort at giving a narrowing construction to the Federal Election Campaign Act's provision requiring that entities falling within the definition of "political committee" make certain financial disclosures. Absent a narrowing construction, the Court noted, the requirement that political committees "disclose their expenditures could raise . . . vagueness problems, for 'political committee' is defined only in terms of amount of annual 'contributions' and 'expenditures,' and could be interpreted to reach groups engaged purely in issue discussion." *Buckley*, 424 U.S. at 79. Accordingly, the Court held:

> To fulfill the purposes of the Act [the term "political committee"] need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate. Expenditures of candidates and of "political committees" so construed can be assumed to fall within the core area sought to be addressed by Congress. They are, by definition, campaign related.

*Id.* The Court reiterated this construction of political committee in *MCFL*. 479 U.S. at 252 n.6 (stating that "an entity subject to regulation as a 'political committee' under the Act is one that is either 'under the control of a candidate or the major purpose of which is the nomination or election of a candidate'").

NCRL argues that an entity can have only one major purpose and that the major purpose test should be predicated on an entity spending more than half of its budget on contributions and expenditures that promote or oppose a candidate's election. Use of a flat monetary trigger, NCRL asserts, is unconstitutional because it looks only to the potential impact of an entity's activities on political debate, rather than an entity's overall activities. Thus, it violates the fundamental principle of the major purpose test in that it fails to identify entities for which express support or opposition of a candidate is so central to their purpose that all their activities can be presumed to advance that purpose.

The district court rejected the proposition that an entity can have but one major purpose and that the only constitutional standard for determining major purpose is one that requires that an entity allocate fifty percent of its disbursements for candidate advocacy. (J.A. at 240 n.1). Whether an entity can have multiple major purposes and whether a certain percentage is constitutionally mandated are issues we need not decide at this time.[3] The constitutionality of North Carolina's major purpose presumption can instead be decided on a more fundamental principle.

In order to frame the issue properly, it is helpful to understand what the major purpose presumption is not. It is not, as the State correctly points out, conclusive proof of an entity's major purpose. The fact that an entity spends over $3,000.00 is only evidence of major purpose. The burden of proving that an organization has as its major purpose the support or defeat of a candidate remains with the State. N.C. Gen. Stat. § 163-278.34A (2001). The presumption merely shifts the burden of production to an entity to offer evidence that its contributions and expenditures were not a major part of its overall activities.

Nevertheless, the constitutional defect of the major purpose presumption is not so much the use of *any* presumption, but the fact that

---

[3]Adopting the narrow construction of the major purpose test advanced by NCRL could lead to curious results however. As the district court noted, an entity with a $3 million budget that expends as much as $1.4 million advocating the election or defeat of a particular candidate would not qualify as a political committee under NCRL's interpretation.

instead of basing the major purpose standard on the nature of the entity and its overall activities, the standard is based on an arbitrary level of spending that bears no relation to the idiosyncracies of the entity. This shifts the focus from the entity itself, where it belongs, to the effect expenditures generally have on an election. The State presented evidence demonstrating that contributions or expenditures in the amount of $3,000.00 are sufficient to have a "significant impact" on a campaign in North Carolina. Whether this is true, and we accept that it is, is immaterial to the determination of whether an entity has as a major purpose to support or oppose a particular candidate.

For example, a $4,000,000.00 organization that spends $3,001.00 and a $4,000.00 organization that spends $3,001.00 would both have the same "significant impact" on an election. Yet while the impact of these entities' spending may be the same, their major purpose is not. Any attempt to define statutorily the major purpose test cannot define the test according to the effect some arbitrary level of spending has on a given election. Such a standard poses the threat of subsuming within its presumption entities that have as their "central organizational purpose . . . issue advocacy, although [they] occasionally engage[ ] in activities on behalf of political candidates." *MCFL*, 479 U.S. at 252 n.6. Rather, the test must be based on the nature and overall activities of the entity itself. The test must examine whether an entity's spending in support of or opposition to a candidate has "become so extensive that [its] major purpose may be regarded as campaign activity." *Id.* at 262 (citing *Buckley*, 424 U.S. at 79). This is accomplished not by simply tabulating an entity's contributions and expenditures, although that is an important factor, but by examining an entity's stated purpose, which is typically reflected in its articles of incorporation, and the extent of an entity's activities and funding devoted to pure issue advocacy versus electoral advocacy. *Id.* at 241-44.[4]

---

[4]The Court in *MCFL* considered MCFL's statement of purpose in its articles of incorporation, its legislative and public demonstration activities, how it raised its finances, and its publications before determining that "[i]ts central organizational purpose is issue advocacy, although it occasionally engages in activities on behalf of political candidates." *MCFL*, 479 U.S. at 241-43, 252 n.6.

The State nevertheless argues that the major purpose presumption is in full accord with *Buckley* and *MCFL* because an entity is afforded the opportunity to rebut the presumption by showing that its electioneering activities were not a major part of its overall activities. Although the statute provides that the major purpose presumption may be rebutted, the ability to rebut the presumption does nothing to ameliorate the unconstitutionality of a fixed monetary threshold that bears no relation to the *Buckley* and *MCFL* major purpose standard.

The Supreme Court has on two occasions considered the constitutionality of somewhat similar statutory presumptions, and on both occasions the Court declared the presumptions unconstitutional. In *Riley v. National Federation of the Blind*, 487 U.S. 781 (1988), the Court considered the propriety of a North Carolina statute that prohibited professional fundraisers from retaining an "unreasonable" or "excessive fee." A fee was defined as prima facie unreasonable or excessive according to the percentage of total revenues collected. *Id.* at 793. A fee exceeding thirty-five percent was "presumed unreasonable," but the fundraiser was provided the opportunity to rebut the presumption by proving either that the solicitation involved the dissemination of information or advocacy or that the charity's "ability to raise money or communicate would be significantly diminished." *Id.* at 785-86.

The Court held that this percentage-based test failed to pass constitutional muster. The Court reasoned that because the "solicitation of charitable contributions is protected speech, . . . using percentages to decide the legality of the fundraiser's fee is not narrowly tailored to the State's interest in preventing fraud." *Id.* at 789. The Court rejected the proposition that the opportunity to rebut the presumption of unreasonableness saved the statute. The Court stated that "even where a prima facie showing of unreasonableness has been rebutted, the factfinder must still make an ultimate determination, on a case-by-case basis, as to whether the fee was reasonable . . . ." *Id.* at 786. "Proof that the solicitation involved the advocacy or dissemination of information is not alone sufficient [to rebut the presumption]; it is merely a factor that is added to the calculus submitted to the factfinder, who may still decide that the costs incurred or the fundraiser's profit were excessive." *Id.* at 793. Under this statute, "every campaign incurring fees in excess of 35% . . . will be subject . . . to potential litigation

over the 'reasonableness' of the fee." *Id.* at 794. Fundraisers exposed to this litigation "must bear the costs of litigation and the risk of a mistaken adverse finding by the factfinder." *Id.* The Court concluded, therefore, that the uncertainty and risk created by "[t]his scheme must necessarily chill speech in direct contravention of the First Amendment's dictates." *Id.*

Similarly, in *Virginia v. Black*, a plurality of the Court declared unconstitutional a Virginia cross-burning statute which provided that "'[a]ny such burning of a cross shall be prima facie evidence of an intent to intimidate a person or group of persons.'" 123 S. Ct. 1536, 1550 (2003) (quoting Va. Code Ann. § 18.2-423 (1996)). The plurality reasoned that the prima facie evidence provision "permits a jury to convict in every cross-burning case in which defendants exercise their constitutional right not to put on a defense," or at a minimum "makes it more likely that the jury will find an intent to intimidate regardless of the particular facts of the case." *Id.* Furthermore, because the "prima facie provision makes no effort to distinguish among . . . different types of cross burnings," it potentially can "'skew jury deliberations toward conviction in cases where the evidence of intent to intimidate is relatively weak.'" *Id.* at 1551 (quoting *infra* at 1561 (Souter, J., concurring in the judgment in part and dissenting in part)). Accordingly, the plurality concluded that the prima facie provision "'create[s] an unacceptable risk of the suppression of ideas,'" *id.* (quoting *Secretary of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 965 n.13 (1984)), and "chills constitutionally protected political speech because of the possibility that a State will prosecute—and potentially convict—somebody engaged only in lawful political speech at the core of what the First Amendment is designed to protect." *Id.*

The presumption at issue here presents the same problems identified by the Court in *Riley* and *Black*. Although arguably less egregious because the burden of proof remains on the State, the chilling effect recognized by the Court in *Riley* and *Black* is nevertheless present. Spending over $3,000.00 in contributions and expenditures may be evidence of major purpose for some entities, but it is not evidence of major purpose for all. Yet the presumption poses the potential of skewing the factfinder's deliberation toward a finding of major purpose for every entity that spends more than $3,000.00 on electoral

advocacy. Even in cases where an entity proffers evidence demonstrating that its major purpose is not to support or oppose a particular candidate, the presumption may encourage a factfinder to err on the side of a finding of major purpose. *See Black*, 123 S. Ct. at 1561 (Souter, J., concurring in the judgment in part and dissenting in part).

Furthermore, entities that exceed the monetary threshold will be subject to litigation and must bear the cost of that litigation. In addition to the costs of litigation, an entity must consider the appreciable risk of a mistaken adverse determination. A determination of major purpose will consequently lead to regulation as a political committee and thereby subject an entity to costly disclosure and reporting requirements. Moreover, an entity subsequently determined to be a political committee that fails to comply with these requirements may be subject to prosecution for a class 2 misdemeanor and imposition of civil fines. The only alternative available to entities unwilling to expose themselves to these costs, therefore, is to not engage in political speech above the level proscribed by the State. But as the Supreme Court concluded in *Riley* and *Black*, such an alternative unacceptably leads to the suppression and chilling of protected political speech.

The State certainly has an interest in regulating an entity's spending aimed at supporting or opposing a particular candidate's election. The State's interest in regulating the level of spending on electoral advocacy, however, is protected by disclosure and reporting requirements applicable to individuals and entities not otherwise subject to reporting requirements. *See* N.C. Gen. Stat. § 163-278.12 (2001). NCRL is required to file with the appropriate board of elections a statement of all independent expenditures and contributions in excess of $100.00. *Id.* § 163-278.12(a)-(b). Similarly, NCRL is required to disclose to the State Board of Elections the identification of each entity making a donation of more than $100.00 to NCRL if the donation was made for the purpose of furthering NCRL's reported independent expenditures or contributions. *Id.* § 163-278.12(c). "The state interest in disclosure therefore can be met in a manner less restrictive than imposing the full panoply of regulations that accompany status as a political committee . . . ." *MCFL*, 479 U.S. at 262.

The State's desire to establish a bright-line rule for when the process of determining an entity's major purpose should commence is understandable.[5] The presumption is easily applied. Administrative convenience, however, does not present a sufficient justification for infringing First Amendment freedoms. *Riley*, 487 U.S. at 795 (stating that "the First Amendment does not permit the State to sacrifice speech for efficiency"). Therefore, because the monetary trigger contained in Section 163-278.6(14) fails to account for the overall activities of an entity and may be used as evidence of an entity's major purpose, we hold that it is unconstitutionally overbroad. We do not suggest, however, that *any* presumption in this context is *per se* unconstitutional. Our holding is limited to the major purpose presumption before us which is based entirely on a monetary standard completely untethered from the other factors identified by the Supreme Court in determining major purposes. The portion of Section 163-278.6(14) relating to the major purpose presumption is therefore substantially overbroad and invalid, and we disagree with the district court in this respect. However, the remaining portions of Section 163-278.6(14) can be severed and given effect without the invalid portion. *See* N.C. Gen. Stat. § 163-278.5 (2001).[6]

V.

In addition to the challenges relating to the definition of political committee, NCRL challenged North Carolina's contribution limit to the extent that it applies to "independent expenditure political action committees" ("IEPAC"). Section 163-278.13 provides that no individual may contribute to any political committee in excess of $4,000.00 during any single election cycle. *Id.* § 163-278.13. This contribution

---

[5]The State contends that the presumption serves as an alert to an entity that is considering undertaking electioneering-type activities to monitor its spending because expenditures in excess of $3,000.00 might provoke a complaint to the Board of Elections. A complaint, in turn, might trigger an inquiry into whether the entity's major purpose was to support or oppose a candidate.

[6]Section 163-278.5 provides in relevant part: "The provisions of this Article are severable. If any provision is held invalid by a court of competent jurisdiction, the invalidity does not affect other provisions of the Article that can be given effect without the invalid provision."

limit applies with equal force to contributions made to IEPACs, *i.e.*, committees that make only independent expenditures. An independent expenditure is defined as an expenditure "that is made without consultation or coordination with a candidate or agent of a candidate." *Id.* § 163-278.6(9a).

The Supreme Court has "'consistently held that restrictions on contributions require less compelling justification than restrictions on independent spending.'" *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 387 (2000) (quoting *MCFL*, 479 U.S. at 259-60). "[A] contribution limit involving 'significant interference' with associational rights [can] survive if the Government demonstrate[s] that contribution regulation [is] 'closely drawn' to match a 'sufficiently important interest.'" *Id.* at 387-88 (quoting *Buckley*, 424 U.S. at 25) (citation omitted) (internal quotation marks omitted). The State has a "sufficiently important interest" in regulating contributions in order to prevent *quid pro quo* corruption of and undue influence upon candidates. The State's interest in preventing corruption, however, is "not confined to bribery of public officials, but extend[s] to the broader threat from politicians too compliant with the wishes of large contributors." *Id.* at 389.

In addressing limitations on independent expenditures, the Supreme Court stated that the absence of coordination or control between the candidate and the IEPAC making the independent expenditure "not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate." *Buckley*, 424 U.S. at 47; *see also FEC v. National Conservative Political Action Comm.*, 470 U.S. 480, 498 (1985) ("*NCPAC*"); *Colorado Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 617-18 (1996) (stating that the fact that independent expenditures are not coordinated with a candidate prevents the "assum[ption], absent convincing evidence to the contrary, that a limitation on political parties' independent expenditures is necessary to combat a substantial danger of corruption of the electoral system"). "The fact that candidates and elected officials may alter or reaffirm their own positions on issues in response to political messages paid for by [political action committees] can hardly be called corruption . . . ." *NCPAC*, 470 U.S. at 498.

While the Supreme Court has not addressed the constitutionality of limits on contributions to IEPACs, the Court has considered the constitutionality of limits on contributions to political action committees that contribute to candidates. *California Med. Ass'n v. FEC*, 453 U.S. 182 (1981) ("*Cal-Med*"). In *Cal-Med*, the Court upheld a limitation on contributions to multi-candidate political committees, which by definition make contributions directly to candidates. Justice Blackmun in his concurrence stressed, however, that a different result would follow if a contribution limit "were applied to contributions to a political committee established for the purpose of making independent expenditures." *Id.* at 203. Justice Blackmun further explained that multi-candidate political committees are "essentially conduits for contributions to candidates, and as such they pose a perceived threat of actual or potential corruption. In contrast, contributions to a committee that makes only independent expenditures pose no such threat." *Id.*

The State argues that it proffered sufficient evidence to demonstrate the corruptive danger posed by independent expenditures and therefore the need to limit contributions to IEPACs. "The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Shrink Missouri*, 528 U.S. at 391. If NCRL's challenge was to the limitation on contributions made to a candidate, either directly or through a political committee, the evidence presented by the State would be sufficient. However, because the corruptive influence of contributions for independent expenditures is more novel and implausible than that posed by contributions to candidates, convincing evidence of corruption is required. *Colorado Republican*, 518 U.S. at 618. The State, however, failed to proffer sufficiently convincing evidence which demonstrates that there is a danger of corruption due to the presence of unchecked contributions to IEPACs. We agree with the district court that the $4,000.00 limitation on contributions to IEPACS is substantially overbroad and unconstitutional.

VI.

The final issue for our consideration is whether the district court erred in holding that NCRL's challenge to Section 163-278.12A was

moot under our holding in *Perry*. NCRL contends the issue is not moot because the district court's injunction in *Perry* prohibited the State from enforcing Section 163-278.12A only against the plaintiff in that action. The district court in *Perry*, however, did not reach the constitutionality of the statute, finding that the issue was moot under *NCRL I*. On appeal in *Perry*, we held that the district court erred in failing to reach the constitutionality of the statute. Nevertheless, because the question was purely a legal one, we determined that a remand was unnecessary and reached the constitutional question. *Perry*, 231 F.3d at 160. We concluded that "[b]ecause Section 12A would allow the regulation of issue advocacy . . . *it is unconstitutionally overbroad and the State is permanently enjoined from enforcing it*." *Id.* at 162 (emphasis added). No limitation as to the application of the injunction was indicated. Accordingly, because the injunction prohibits the State from enforcing Section 163-278.12A, a determination by the district court in this action was unnecessary and the district court was correct in declaring NCRL's challenge moot.

## VII.

In sum, we conclude that the district court did not err in holding the context prong of North Carolina's express advocacy test unconstitutional. Nor did the district court err in declaring the limit on contributions unconstitutional to the extent that it applies to IEPACs. We conclude, however, that the district court erred in failing to hold that the major purpose presumption was unconstitutional. Finally, we reject NCRL's claim that the district court erred in finding its challenge to Section 163-278.12A moot. Thus, for the reasons stated, the judgment of the district court is hereby

*AFFIRMED IN PART AND REVERSED IN PART*.

MICHAEL, Circuit Judge, concurring in part and dissenting in part:

I concur in parts I, II, IV, and V of the majority's opinion. I concur in part III insofar as it discusses and strikes down the second sentence of N.C. Gen. Stat. § 163-278.14A(a)(2), a statute that describes evidence that is sufficient to prove "that communications are 'to support or oppose the nomination or election of one or more clearly identified candidates.'" *Id.* § 163-278.14A (2002). I respectfully dissent from

the majority's decision in part III to strike down the first sentence of § 163-278.14A(a)(2). The first sentence is an explicative definition of express advocacy that passes muster under *Federal Election Commission v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238 (1986) (*MCFL*), and *Buckley v. Valeo*, 424 U.S. 1 (1976). I also concur in the result reached by the majority in part VI, but I would reach that result by slightly different reasoning.

I.

Again, § 163-278.14A describes the type of evidence necessary to prove that an individual's or organization's communications expressly advocate the election or defeat of a candidate. The first sentence of the provision at issue in this case, § 163-278.14A(a)(2), states that such evidence may include "[e]vidence of financial sponsorship of communications whose essential nature expresses electoral advocacy to the general public and goes beyond a mere discussion of public issues in that they direct voters to take some action to nominate, elect, or defeat a candidate in an election." N.C. Gen. Stat. § 163-278.14A(a)(2) (2002). The second sentence of the provision goes on to explain that "[i]f the course of action is unclear, contextual factors . . . may be considered in determining whether the action urged could only be interpreted by a reasonable person as advocating the nomination, election, or defeat of that candidate in that election." *Id.* My disagreement with the majority, which strikes down the entire provision, relates only to the first sentence of § 163-278.14A(a)(2). I agree with the majority that only express advocacy can be regulated and that we must look to the language used in the communication, rather than its context, to determine whether it is express advocacy. *See ante* at 12-13. Because the second sentence of § 163-278.14A(a)(2) violates this standard, I agree that it must be struck down. The first sentence, however, only applies to communications whose "essential nature . . . direct[s] voters to take some action to nominate, elect, or defeat a candidate in an election." § 163-278.14A(a)(2). Unlike the second sentence, the first does not authorize the regulator to look beyond the text of the communication; specifically, it does not permit the regulator to consider what the communication's effect might be on a reasonable listener.

The first sentence of § 163-278.14A(a)(2) is faithful to the Supreme Court's analysis in *MCFL*. There, MCFL published a flier

that described individual candidates' voting records on pro-life issues and urged readers to "VOTE PRO-LIFE," while claiming that the flier did not "represent an endorsement of any particular candidate." *MCFL*, 479 U.S. at 243-44. The Court noted that even though the flier did not use the same language cited in *Buckley*, 424 U.S. at 44 n.52, such as "Vote for Smith," it was "*in effect* an explicit directive." *MCFL*, 479 U.S. at 249 (emphasis added). In other words, the flier's "essential nature" was not changed just because it avoided using any of the words in *Buckley*'s examples of express advocacy. *Id.*

*MCFL* thus makes clear that a speaker may engage in express advocacy without using the magic words mentioned in *Buckley*. I acknowledge that § 163-278.14A(a)(1), the North Carolina provision that is *not* under challenge, would cover the sort of express advocacy used by MCFL. However, the phrases and constructions described in § 163-278.14A(a)(1) are examples and are not meant to be an exhaustive list of exhortations that amount to express advocacy. Just as the examples in *Buckley* did not cover the clear message of exhortation in the flier in *MCFL*, so too might there be a communication of express advocacy that does not correspond neatly with the more expansive list of examples in § 163-278.14A(a)(1). For instance, if an organization like MCFL published a sample ballot, clearly marking the boxes next to pro-life candidates and leaving others blank (or striking through other candidates' names), that should fall within the category of express advocacy for the election or defeat of particular candidates. Nevertheless, such an exhortation might not fall within the scope of § 163-278.14A(a)(1) because the exhortation does not include any language listed in that provision or any language that is similar to the examples given. The first sentence of § 163-278.14A(a)(2), however, would cover the sample ballot situation.

The first sentence of § 163-278.14A(a)(2) focuses only on express advocacy. However, rather than defining express advocacy by example or by the use of magic words, it provides an explicative definition. The sentence defines express advocacy as a communication that "goes beyond a mere discussion of public issues in that [it] direct[s] voters to take some action to nominate, elect, or defeat a candidate in an election." § 163-278.14A(a)(2). This definition is consistent with *MCFL*, 479 U.S. at 249 (noting that the flier was express advocacy because it went beyond "mere discussion of public issues" and instead

"provide[d] in effect an explicit directive" to vote for certain candidates), and *Buckley*, 424 U.S. at 44 (describing communications "that in express terms advocate the election or defeat of a clearly identified candidate"). Unlike the second sentence of the provision, the first sentence avoids the error of relying on the effect on the speaker or of relying on the broader context in which the communication appears. *See Va. Soc'y for Human Life, Inc. v. Fed. Election Comm'n*, 263 F.3d 379, 391-92 (4th Cir. 2001). The first sentence requires, in other words, that the communication "literally include words which in and of themselves advocate the election or defeat of a candidate," *VSHL*, 263 F.3d at 391 (internal quotations and emphasis omitted), without limiting or detracting from the unchallenged companion provision, § 163-278.14A(a)(1), which defines express advocacy by use of examples. In my opinion, the first sentence of § 163-278.14A(a)(2) is constitutional.

As the majority notes, North Carolina's election laws include a severability provision. N.C. Gen. Stat. § 163-278.5 (2002); *see also ante* at 26 n.6. I would therefore uphold the first sentence of § 163-278.14A(a)(2) but join in the majority's opinion striking down the second sentence of that subsection.

II.

Finally, I concur in the result reached in part VI of the majority's opinion, which concludes that NCRL's challenge to § 163-278.12A, relating to the reporting of expenditures, is moot. I would reach that conclusion by a slightly different path. As the majority notes, our opinion in *Perry v. Bartlett*, 231 F.3d 155, 162 (4th Cir. 2000), states that § 163-278.12A is unconstitutional. Our opinion in *Perry*, however, affirmed the district court's injunction order, which only prohibits North Carolina from enforcing § 163-278.12A against the *Perry* plaintiffs. I do not believe, as does the majority, that the application of the injunction in *Perry* is unlimited. Nevertheless, I agree in the end that NCRL's challenge to § 163-278.12A is moot because North Carolina's brief in this appeal acknowledges that this section is unconstitutional and is not enforceable. *See Telco Communications, Inc. v. Carbaugh*, 885 F.2d 1225, 1230-31 (4th Cir. 1989) (finding an issue moot when there was no "reasonable expectation" that the state would seek to enforce the statute in question because the state "con-

ceded the unconstitutionality of the statute"). I therefore agree with the majority's conclusion that NCRL's challenge to § 163-278.12A is moot.