Affirmed in part and reversed in part by published opinion. Judge WILKINSON wrote the majority opinion, in which Chief Judge WILLIAMS joined. Judge MICHAEL wrote a dissenting opinion.
OPINION
WILKINSON, Circuit Judge:
In this case, North Carolina Right to Life, Inc. (“NCRL”) and two of its affiliated political committees challenge the constitutionality of various provisions of North Carolina’s law governing the financing of political campaigns. For the reasons that follow, we hold that the provisions in question violate the First and Fourteenth Amendments — and are hence unenforceable against NCRL, its affiliates, and any similarly situated entities.
In doing so, we recognize that the law of campaign finance is quite complicated and in some flux. Courts, state governments, and those involved in the political process are doing what they can to navigate this difficult terrain, and we are conscious of the fact that North Carolina went back in good faith to the drawing board to craft a legislative response to our earlier decision in North Carolina Right to Life, Inc. v. Bartlett, 168 F.3d 705 (4th Cir.1999). But it is nevertheless our unflagging obligation to apply constitutional standards to state legislative enactments, and, in doing so here, we find that the provisions before us simply go too far in regulating ordinary political speech to be considered constitutional.
I.
A.
Three related plaintiffs challenge the constitutionality of North Carolina’s campaign finance laws. The lead plaintiff is North Carolina Right to Life, Inc. (“NCRL”), a non-profit, membership corporation, incorporated in North Carolina. NCRL’s purpose is the protection of human life. In furtherance of that purpose, NCRL, among other things, provides information to the public about abortion and euthanasia. In the past, NCRL has di *278 rectly contributed to candidates for state office, although it did not do so during the election cycle immediately preceding the commencement of this suit. NCRL claims that its reluctance to contribute resulted from its fear of being designated a “political committee” under North Carolina election law, as such committees are subject to numerous reporting and other requirements.
The other two plaintiffs in this case are distinct legal entities affiliated with NCRL. First, North Carolina Right to Life Political Action Committee (“NCRL-PAC”) is an internal political committee established by NCRL in 1982. NCRL-PAC’s primary purpose is to engage in express advocacy — the support or opposition of specific candidates and political parties — consistent with the views of NCRL. Second, North Carolina Right to Life Committee Fund for Independent Political Expenditures (“NCRL-FIPE”) is a political committee established by NCRL in 1999. NCRL-FIPE’s sole purpose is to make independent expenditures, which are defined as those political expenditures “made without consultation or coordination with a candidate or agent of a candidate.” N.C. Gen.Stat. § 163-278.6(9a) (2007). Thus, unlike NCRL and NCRL-PAC, NCRL-FIPE makes no contributions of any kind to political candidates.
B.
This appeal is the next act in a long drama that has played out in federal court for over a decade. The foundation of the present litigation was laid in 1996, when NCRL filed suit in federal district court arguing that several provisions of the North Carolina campaign finance laws were unconstitutional under the First and Fourteenth Amendments. This court largely agreed with NCRL and struck down many of the laws in North Carolina Right to Life, Inc. v. Bartlett, 168 F.3d 705 (4th Cir.1999) (“NCRL /”), cert. denied, 528 U.S. 1153, 120 S.Ct. 1156, 145 L.Ed.2d 1069 (2000).
In response to this court’s decision, the North Carolina General Assembly set out to revise its system of campaign finance regulation. After studying and debating the issue, the General Assembly passed legislation that amended, deleted, and added statutes regulating campaign finance. See N.C. Sess. Laws 1999-31, 424, & 453.
On November 30, 1999, immediately after North Carolina obtained pre-clearance from the Department of Justice to implement its new campaign finance regulations, NCRL, NCRL-PAC, and NCRL-FIPE (collectively, “the plaintiffs”) filed the present suit against various North Carolina officers in their official capacities (collectively, “North Carolina” or “the defendants”). The plaintiffs sought declaratory and injunctive relief under 42 U.S.C. § 1983 and the First and Fourteenth Amendments, arguing that the court should enjoin the enforcement of five of North Carolina’s new campaign finance statutes against the plaintiffs and similarly situated parties.
Three of the plaintiffs’ challenges are relevant to this appeal.[1] First, the plaintiffs argued that North Carolina unconstitutionally regulated issue advocacy in prescribing a standard that, through context, attempts to determine if a communication supports or opposes the nomination or election of a particular candidate (the *279 “context prong”). See N.C. Gen.Stat. § 163-278.14A(a)(2) (2007). Second, the plaintiffs challenged the constitutionality of North Carolina’s definition of “political committee,” because it threatened to impose numerous and burdensome obligations on organizations not primarily focused on nominating and electing political candidates. See id. § 163-278.6(14). Finally, the plaintiffs argued that North Carolina unconstitutionally applied contribution limits to political committees, such as NCRL-FIPE, which make only independent expenditures and do not contribute to candidates’ campaigns. See id. § 163— 278.13.
On September 23, 2003, this court affirmed the district court’s judgment as to the facial unconstitutionality of the “context prong,” and the unconstitutionality of the contribution limits, as applied to NCRL-FIPE. See North Carolina Right to Life v. Leake, Inc., 344 F.3d 418, 435 (4th Cir.2003) (“NCRL II”). The court likewise held that the definition of political committee was unconstitutionally over-broad. Id. It thus enjoined the enforcement of all of the statutory provisions at issue.
North Carolina subsequently petitioned the Supreme Court for certiorari, asking that the matter be remanded for further consideration in light of the Court’s then recent decision in McConnell v. FEC, 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003). On April 26, 2004, the Supreme Court granted North Carolina’s petition, vacated this court’s decision, and remanded the case to the Fourth Circuit for further consideration in light of McConnell. Leake v. North Carolina Right to Life, Inc., 541 U.S. 1007, 124 S.Ct. 2065, 158 L.Ed.2d 617 (2004). This court in turn remanded the case to the district court on August 12, 2004.
On remand, the parties filed cross motions for summary judgment and supporting memoranda addressing the effect of McConnell. In addition, North Carolina argued, relying partly on McConnell, that the plaintiffs lacked standing because they had failed to take action after the statutes in question had been enjoined.
On March 29, 2007, the district court found that the plaintiffs still had standing to proceed with their challenges.[2] See North Carolina Right to Life, Inc. v. Leake, 482 F.Supp.2d 686, 692-93 (E.D.N.C.2007). In addition, the district court found that, even after McConnell, the context prong remained facially unconstitutional, and North Carolina’s contribution limits remained unconstitutional as applied to independent expenditure committees such as NCRL-FIPE. See id. at 699-700. Finally, the district court held that North Carolina’s definition of political *280 committee was unconstitutional only insofar as it incorporated the context prong. The definition of political committee was left otherwise enforceable. Id.
Both parties appeal from this decision. The plaintiffs argue that North Carolina’s definition of political committee is unconstitutionally vague and substantially over-broad, and should therefore be enjoined. See N.C. Gen.Stat. § 163-278.6(14) (2007). North Carolina challenges the district court’s decisions holding the “context prong” facially unconstitutional, see id. § 163-278.14A(a)(2), and the contribution limits unconstitutional as applied to NCRL-FIPE, see id. § 163-278.13.
II.
We first consider whether North Carolina’s method for determining if a communication “supports or opposes the nomination or election of one or more clearly identified candidates” unconstitutionally regulates issue advocacy.
A.
Many of North Carolina’s campaign finance regulations — including, for example, reporting requirements and contribution limits — are focused on campaign expenditures and contributions. See, e.g., id. § 163-278.8; § 163-278.11; § 163-278.13. Both “expenditure” and “contribution” are terms of art specifically defined in North Carolina’s General Statutes. Expenditures are defined to include any “purchase, advance, conveyance, deposit,” etc., made “to support or oppose the nomination [or] election ... of one or more clearly identified candidates.” Id. § 163-278.6(9). Contributions — at least “to candidates” — ■ are similarly defined as those “advancefs], conveyance[s],” etc., that are made “to support or oppose the nomination or election of one or more clearly identified candidates.” Id. § 163-278.6(6). Since the definitions of “expenditure” and “contribution” are both limited' — at least in part— by this same verbal formula, the determination as to whether an action is taken “to support or oppose ... a clearly identified candidate” is thus one of the foundations of North Carolina’s campaign finance regulatory scheme.
Section 163-278.14A(a) of North Carolina’s General Statutes employs a two-pronged test to determine whether “an individual acted to ‘to support or oppose the nomination or election of one or more clearly identified candidates.’ ” Each of the two prongs of § 163-278.14A(a) delineates a class of “communications.” If an individual “financially] sponsor[s]” a “communication” that meets either of the two prongs, he or she is deemed to have acted in support or opposition of a clearly identified candidate.
The first prong of § 163-278.14A(a) classifies communications as supporting or opposing a clearly identified candidate when they explicitly use any of a set of carefully delineated election-related words or phrases. See id. § 163-278.14A(a)(l). Examples of such phrases include: “vote for,” “reelect,” “support,” “cast your ballot for,” and “(name of candidate) for (name of office).” Id.
In an attempt to capture communications that support or oppose candidates while avoiding the use of the words explicitly delineated by the first prong, the second prong of North Carolina’s test considers a communication to be in support or opposition of a candidate if its “essential nature ... goes beyond a mere discussion of public issues in that [it] direct[s] voters to take some action to nominate, elect, or defeat a candidate in an election.” Id. § 163-278.14A(a)(2). In particular, if the “essential nature” of a communication is *281 “unclear,” the statute states that regulators “may” consider:
contextual factors such as the language of the communication as a whole, the timing of the communication in relation to events of the day, the distribution of the communication to a significant number of registered voters for that candidate’s election, and the cost of the communication ... in determining whether the action urged could only be interpreted by a reasonable person as advocating the nomination, election, or defeat of that candidate in that election.

Id.

The plaintiffs in this case argue that the second prong of N.C. Gen.Stat. § 163— 278.14A(a) — which attempts to determine the “essential nature” of a communication by considering “contextual factors” — is unconstitutionally overbroad and vague. In particular, the plaintiffs allege that, in enacting this context-based prong, North Carolina’s legislature exceeded its limited power to regulate electoral speech and violated the plaintiffs’ First and Fourteenth Amendment rights by regulating constitutionally protected political speech. The plaintiffs further contend that “there is no way for a speaker to know in advance how to determine” if their communication falls within the ambit of the context-based prong, therefore rendering § 163-278.14A(a)(2) void for vagueness. Appellant Reply Brief at 44.
B.
Our analysis of § 163-278.14A(a)(2) begins — as does nearly any analysis of the constitutionality of campaign finance regulation — with the Supreme Court’s landmark decision in Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). In Buckley, the Court recognized that legislatures have the well established power to regulate elections, id. at 13, 96 S.Ct. 612, and that, pursuant to that power, they may establish standards that govern the financing of political campaigns. In particular, the Court identified “limit[ing] the actuality and appearance of corruption” as an important governmental interest served by campaign finance regulation. Id. at 26, 96 S.Ct. 612. The Court simultaneously noted, however, that campaign finance restrictions “operate in an area of the most fundamental First Amendment activities,” and thus threaten to limit ordinary “political expression.” Id. at 14, 96 S.Ct. 612.
The Buckley Court therefore recognized the need to cabin legislative authority over elections in a manner that sufficiently safeguards vital First Amendment freedoms. It did so by demarcating a boundary between regulable election-related activity and constitutionally protected political speech: after Buckley, campaign finance laws may constitutionally regulate only those actions that are “unambiguously related to the campaign of a particular ... candidate.” Id. at 80, 96 S.Ct. 612. This is because only unambiguously campaign related communications have a sufficiently close relationship to the government’s acknowledged interest in preventing corruption to be constitutionally regulable. Id.
To date, the Court has only recognized two categories of activity that fit within Buckley’s unambiguously campaign related standard. First, legislatures may regulate “communications that in express terms advocate the election or defeat of a clearly identified candidate for” public office. Id. at 44, 96 S.Ct. 612. In particular, Buckley delineated specific words that exemplify such “express advocacy” — words “such as ‘vote for,’ ‘elect,’ ‘support,’ ‘cast your ballot for,’ ‘Smith for Congress,’ ‘vote against,’ ‘defeat,’ ‘reject.’ ” Id. at 44 n. 52, *282 96 S.Ct. 612. Buckley thus stands for the proposition that legislatures may constitutionally regulate communications that use the obviously campaign-related “magic words of express advocacy.” See Fed. Election Comm’n v. Wisconsin Right to Life, Inc.,—U.S.--, 127 S.Ct. 2652, 2681, 168 L.Ed.2d 329 (2007) (“WRTL”) (Scalia, J., dissenting). Focusing regulation in this way ensures that campaign finance restrictions do not sweep so broadly as to restrict ordinary political speech.
Second, the Supreme Court has recently held that legislatures have a very limited authority to regulate campaign communications that are “the functional equivalent of express advocacy.” McConnell v. Fed. Election Comm’n, 540 U.S. 93, 206, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003); see also WRTL, 127 S.Ct. at 2664. Under Buckley’s “express advocacy” standard, the Court recognized that advertisers were able to insulate themselves from regulation by simply “eschewing the use of magic words.” McConnell, 540 U.S. at 193, 124 S.Ct. 619. Since advertisements could be free of magic words, but “no less clearly intended to influence [an] election,” the Court stated that strict adherence to Buckley’s approach could render the legislative power to regulate elections “functionally meaningless.” Id.
The Court thus defined a category of activity — beyond the “magic words” identified in Buckley — to be regulable as the “functional equivalent of express advocacy.” In order to protect political expression, however, the Court has narrowly circumscribed this category, because any attempt to identify communications as election-related without focusing on words that explicitly label them as such threatens to infringe on protected First Amendment liberties. See WRTL, 127 S.Ct. at 2663-70.
Therefore, to be considered the “functional equivalent of express advocacy,” a communication must meet two separate requirements. First, the communication must qualify as an “electioneering communication,” defined by the Bipartisan Campaign Reform Act of 2002 (“BCRA”), 116 Stat. 91, 2 U.S.C. § 434(f)(3)(A)(i) (2000 ed. & Supp. IV), as a “broadcast, cable, or satellite communication” that refers to a “clearly identified candidate” within sixty days of a general election or thirty days of a primary election. WRTL, 127 S.Ct. at 2669 n. 7 (stating that a communication must meet the “brightline requirements” of the BCRA’s definition of “electioneering communication” to be re-gulable as the “functional equivalent of express advocacy”).
Second, a communication can be deemed the “functional equivalent of express advocacy only if [it] is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate.” Id. at 2667. The purpose of this requirement is to avoid chilling political expression by forcing a speaker to have to defend his communication from regulation. See id. at 2666-67. Thus, for any test to meet the “functional equivalent” standard, it must “eschew ‘the open-ended rough-and-tumble of factors,’ ” which invite burdensome discovery and lengthy litigation. Id. at 2666 (quoting Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 547, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995)). Taken together, these two requirements should be sufficiently “protective of political speech” to allow legislatures to regulate beyond Buckley’s “magic words” approach. Id. at 2669 n. 7.
Before we apply these standards to N.C. GemStat. § 163-278.14A(a)(2), a quick summary is in order. Pursuant to their power to regulate elections, legislatures may establish campaign finance laws, so *283 long as those laws are addressed to communications that are unambiguously campaign related. The Supreme Court has identified two categories of communication as being unambiguously campaign related. First, “express advocacy,” defined as a communication that uses specific election-related words. Second, “the functional equivalent of express advocacy,” defined as an “electioneering communication” that “is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate.” This latter category, in particular, has the potential to trammel vital political speech, and thus regulation of speech as “the functional equivalent of express advocacy” warrants careful judicial scrutiny.
C.
Given the Supreme Court’s articulation of the permissible extent of campaign finance legislation, it is clear that N.C. Gen.Stat. § 163-278.14A(a)(2) is unconstitutional. Section 163-278.14A(a)(2) regulates speech that is neither “express advocacy” nor its “functional equivalent” and, therefore, strays too far from the regulation of elections into the regulation of ordinary political speech.
To begin, § 163-278.14A(a)(2) clearly regulates more than “express advocacy.” Section 163-278.14A(a)(l) — the first prong of North Carolina’s attempt to identify speech that supports or opposes a candidate — codifies Buckley’s “magic words”-— based approach. Since the context-based prong of § 163-278.14A(a)(2) does not identify speech as regulable by delineating election-related words or phrases, its scope, by definition, extends beyond express advocacy.
To be constitutional, therefore, the regulatory scope of § 163-278.14A(a)(2) must fall within the ambit of the Supreme Court’s definition of the “functional equivalent of express advocacy.” It does not, however, since it fails to meet either of the two requirements established by the Supreme Court relating to that term of art. First, § 163-278.14A(a)(2) does not meet the BCRA’s definition of “electioneering communication.” The BCRA carefully limited the definition of “electioneering communications” to communications that refer to specific people — “clearly identified candidates” — for a specific period of time before an election — thirty days before a primary and sixty days before a general election. In contrast, § 163-278.14A(a)(2) tries to divine the “essential nature” of a communication from the perspective of a “reasonable person,” and it does so without explicitly limiting its scope to either specific people or a specific time period.
Second, it cannot be said that communications falling within the ambit of § 163— 278.14A(a)(2) are “susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate.” As stated earlier, WRTL specifically counseled against the use of factor-based standards to define the boundaries of regulable speech, since such standards typically lead to disputes over their meaning and therefore litigation. See WRTL, 127 S.Ct. at 2666.
Section 163-278.14A(a)(2) runs directly counter to the teaching of WRTL when it determines whether speech is regulable based on how a “reasonable person” interprets a communication in light of four “contextual factors.” This sort of ad hoc, totality of the circumstances-based approach provides neither fair warning to speakers that them speech will be regulated nor sufficient direction to regulators as to what constitutes political speech. The very terms of North Carolina’s statute— including, but not limited to, “essential nature,” “the language of the communication as a whole,” “the timing of the communica *284 tion in relation to events of the day,” “the distribution of the communication to a significant number of registered voters for that candidate’s election,” and “the cost of the communication” — are clearly “susceptible” to multiple interpretations and capable of encompassing ordinary political speech unrelated to electoral activity. For instance, how is a speaker — or a regulator for that matter — to know how the “timing” of his comments “relate” to the “events of the day”? Likewise, how many voters would be considered “significant”? And at what “cost” does political speech become regulable?
There is no answer to any of these questions. At least not in the text of § 163— 278.14A(a)(2). Neither the regulator nor the regulated can possibly be expected to know when the “essential nature” of speech is deemed to “direct voters to take some action to nominate, elect, or defeat a candidate in an election” based on these vague criteria. Thus, § 163-278.14A(a)(2) fails to satisfy the second requirement of the Supreme Court’s “functional equivalent of express advocacy” approach.
It is in short quite clear that the scope of N.C. GemStat. § 163-278.14A(a)(2) extends beyond both “express advocacy” and its “functional equivalent.” Section 163— 278.14A(a)(2) is not limited to an express group of election-related words, and its ad hoc, context-based, totality of the circumstances approach is “susceptible” of interpretations “other than as an appeal to vote for or against a specific candidate.” It is therefore necessary for us to strike § 163— 278.14A(a)(2) as unconstitutional.
To do otherwise would offend basic First Amendment values. In limiting campaign finance regulation to “express advocacy” and its “functional equivalent,” the Supreme Court struck a balance between the legislature’s authority to regulate elections and the public’s fundamental First Amendment right to engage in political speech. By carefully defining both of these terms of art, the Court not only cabined the legislature’s regulatory power, but it also ensured that potential speakers would have clear notice as to what communications could be regulated, thereby ensuring that political expression would not be chilled.
Section 163-278.14A(a)(2) upsets this balance. Section 163-278.14A(a)(2), as noted, does not conform with the definition of either “express advocacy” or “the functional equivalent of express advocacy,” and therefore threatens to regulate the ordinary political speech that is democracy’s lifeblood. Whether the speech is pro-life, pro-choice, or somewhere in between makes no difference — it addresses an issue of unquestioned public import, and it is on that account protected. And even if some regulable speech falls within the ambit of § 163-278.14A(a)(2), the statute’s open-ended terms do not lend themselves to a principled limiting construction, nor does the State even propose one. See NCRL II, 344 F.3d at 428 (finding that § 163-278.14A(a)(2) is not “readily susceptible” to a limiting construction). Furthermore, these same open-ended terms provide little ex ante notice to political speakers as to whether their speech will be regulated. Instead, speakers are left to guess and wonder whether a regulator, applying supple and flexible criteria, will make a post hoc determination that their speech is re-gulable as electoral advocacy. This approach simply guarantees that ordinary political speech will be chilled, the very speech that people use to express themselves on all sides of those issues about which they care most deeply.
In WRTL, the Supreme Court noted that “a test based on the actual effect speech will have on an election or a particular segment of the target audience ... *285 unquestionably ehill[s] a substantial amount of political speech.” WRTL, 127 S.Ct. at 2666. This insight is plainly applicable to § 163-278.14A(a)(2), which employs a test based on the effect a communication has on a “reasonable person”— ostensibly the target audience of most political communication. We therefore hold that § 163-278.14A(a)(2) “unquestionably chill[s] a substantial amount of political speech” and declare the statute unconstitutionally overbroad and vague.[3]
In reaching this conclusion, we recognize that plaintiffs must overcome a “heavy burden” to succeed on a facial challenge to legislation. McConnell, 540 U.S. at 207, 124 S.Ct. 619; see also Broadrick v. Oklahoma, 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Indeed, our circuit has indicated that the facial invalidation of a statute for overbreadth is “strong medicine to be applied sparingly and only as a last resort.” United Seniors Ass’n, Inc. v. Social Sec. Admin., 423 F.3d 397, 406 (4th Cir.2005) (internal quotations omitted). We recognize, of course, that McConnell upheld the facial constitutionality of the BCRA’s regulation of “the functional equivalent of express advocacy,” see McConnell, 540 U.S. at 204-06, 124 S.Ct. 619, and that the Court in WRTL was entertaining an “as-applied challenge” to the same statute, see WRTL, 127 S.Ct. at 2659.
Neither of these cases, however, confronted a statute with the multiple First Amendment deficiencies that North Carolina’s definition displays. As discussed above, nothing in BCRA even approached the First Amendment infirmities present here: that is to say the complete lack of notice as to what speech is regulable, and the unguided discretion given to the State to decide when it will move against political speech and when it will not.
The number of as-applied challenges necessary to remedy the over-breadth and vagueness of this multi-factored statutory test would involve many different lawsuits and litigation that would take years to conclude. In the meantime, political speakers would be left at sea, and, worse, subject to the prospect that the State’s view of the acceptability of the speaker’s point of view would influence whether or not administrative enforcement action was initiated. Nothing in McConnell, WRTL, or any First Amendment tradition that we know of forces political speakers to incur these sorts of protracted costs to ascertain nothing more than the scope of the most basic right in a democratic society — the right to engage in discussion of issues of unquestioned public importance.
Whatever effect WRTL may or may not have had upon McConnell (a point on which no circuit court should engage in cloudy crystal ball-gazing), we think that the infirmities of North Carolina’s ap *286 proach — which determines whether speech is regulable based on how a “reasonable person” interprets the speech’s “essential nature” in light of four “contextual factors” — are too evident to ignore. Thus, while we reaffirm the principle in United Seniors Association, 423 F.3d at 406, that striking down legislation on the basis of facial invalidity is “strong medicine” to be “sparingly” applied, to ignore the challenge here would be to uphold a statute far beyond anything approved in McConnell, and in direct contradiction to the most recent formulation by the Supreme Court in this area of campaign finance law.
III.
We next consider whether North Carolina’s definition of political committee unconstitutionally burdens political expression.
A.
Although NCRL-PAC and NCRL-FIPE are political committees, NCRL argues vigorously that it is not. Under North Carolina law, political committees face a significant regulatory burden. See NCRL I, 168 F.3d at 712 (noting that “the consequences” of being labeled a political committee are “substantial”). Not only must they appoint a treasurer who the State shall train before every election cycle, but they must also file a statement of organization that reveals all financial depository information. See N.C. Gen.Stat. § 163-278.7. In addition, political committees face costly and timely disclosure requirements that essentially allow a state to scrutinize in detail an organization’s affairs. See id. (must self-identify as affiliated with a candidate, political party, or other political committee); id. § 163-278.8 (must keep detailed records of and report all disbursements, with additional requirements for “media expenses”); id. § 163— 278.9 (detailing reports that must be filed with the State Board of Elections); id. § 163-278.11 (must report detailed information about donors). Among other regulations, political committees also face limits on the amount of donations they can receive in any one election cycle from any individual or entity. See id. § 163-278.13.
Unsurprisingly, given the burdensome consequences of the appellation, “political committee” is a term of art specifically defined by the North Carolina code. Section 163-278.6(14) of North Carolina’s General Statutes defines a political committee as:
a combination of two or more individuals ... that makes, or accepts anything of value to make, contributions or expenditures and has one or more of the following characteristics:
a. Is controlled by a candidate;
b. Is a political party or executive committee of a political party or is controlled by a political party or executive committee of a political party;
c. Is created by a corporation, business entity, insurance company, labor union, or professional association pursuant to § 163 — 278.19(b); or
d. Has as a major purpose to support or oppose the nomination or election of one or more clearly identified candidates.
Id. § 163-278.6(14), amended by N.C. Sess. Laws 2007-391.[4]
*287 The plaintiffs in this case argue that North Carolina’s definition of political committee is unconstitutionally overbroad and vague. Specifically, the plaintiffs contend that Supreme Court precedent only permits the regulation of entities that have the major purpose of supporting or opposing a candidate, and, therefore, § 163-278.6(14), by regulating entities that have the support or opposition of a candidate as “a major purpose,” unconstitutionally burdens protected political speech. Furthermore, the plaintiffs argue that the manner in which North Carolina determines an organization’s “major purpose” provides little guidance to potentially regulated entities and is thus void for vagueness.
B.
Our analysis of North Carolina’s political committee definition begins at precisely the same point as our previous analysis of the “context prong”: with Buckley v. Valeo’s mandate that campaign finance laws must be “unambiguously related to the campaign of a particular ... candidate.” See Buckley, 424 U.S. at 80, 96 S.Ct. 612. As discussed earlier, this requirement ensures that the constitutional regulation of elections — and the financing of campaigns, in particular — does not sweep so broadly as to become an unconstitutional infringement on protected political expression.
Buckley applied this “unambiguously campaign related” requirement when analyzing the permissible scope of political committee regulation. Since designation as a political committee often entails a significant regulatory burden — as evidenced by the requirements imposed by North Carolina — the Court held that only entities “under the control of a candidate or the major purpose of which is the nomination or election of a candidate” can be so designated. Id. at 79, 96 S.Ct. 612 (emphasis added).
The parties in this case dispute the meaning of Buckley’s directive that only organizations that have “the major purpose” of supporting or opposing a candidate can be regulated as a political committee. The plaintiffs contend that the definite article is crucial — the Court meant what it said when it said “the major purpose” — and that the support or opposition of a candidate must at least be the primary purpose of an organization for it to be designated as a political committee. Conversely, North Carolina argues that the definite article is not critical' — -the Court could have just as easily said “a major purpose” — and that supporting or opposing a candidate need only be an important goal of an organization for it to be regula-ble.
Viewed in light of Buckley’s goals, it is clear that the importance the plaintiffs attach to the definite article is correct. Buckley’s articulation of the permissible scope of political committee regulation is best understood as an empirical judgment as to whether an organization primarily engages in regulable, election-related speech. Thus, the Court in Buckley must have been using “the major purpose” test to identify organizations that had the election or opposition of a candidate as their only or primary goal — this ensured that the burdens facing a political committee largely fell on election-related speech, rather than on protected political speech. Id. (stating that political committees, as defined by “the major purpose” test, are “by definition, campaign related”). If organizations were regulable merely for having the support or opposition of a candidate as “a major purpose,” political committee burdens could fall on organizations *288 primarily engaged in speech on political issues unrelated to a particular candidate. This would not only contravene both the spirit and the letter of Buckley’s “unambiguously campaign related” test, but it would also subject a large quantity of ordinary political speech to regulation. See, e.g., id. at 80, 96 S.Ct. 612.
Subsequent case law affirms the plaintiffs interpretation. To begin, the Supreme Court reaffirmed Buckley’s “the major purpose” test in Federal Election Commission v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (“MCFL ”). There, the Court stated that an organization could be classified as a political committee if “the organization’s major purpose may be regarded as campaign activity,” and referred to regulable political committees as “groups whose primary objective is to influence political campaigns.” Id. at 262, 107 S.Ct. 616 (emphasis added). Furthermore, McConnell recently quoted Buckley’s “the major purpose” language favorably. See McConnell, 540 U.S. at 170 n. 64, 124 S.Ct. 619. The Supreme Court has thus not relaxed the requirement that an organization have “the major purpose” of supporting or opposing a candidate to be considered a political committee. And given the Supreme Court’s direction on this issue, it is unsurprising that a number of lower courts have also adopted Buckley’s “the major purpose” test in some form, highlighting that regulation as a political committee is only proper if an organization primarily engages in election-related speech. See, e.g., California Pro-Life Council, Inc. v. Getman, 328 F.3d 1088, 1104 n. 21 (9th Cir.2003); Fed. Election Comm’n v. Machinists Non-Partisan Political League, 655 F.2d 380, 391-92 (D.C.Cir.1981); Richey v. Tyson, 120 F.Supp.2d 1298, 1311 (S.D.Ala.2000); Voile v. Webster, 69 F.Supp.2d 171, 174-76 (D.Me.1999); New York Civil Liberties Union, Inc. v. Acito, 459 F.Supp. 75, 84 n. 5, 89 (S.D.N.Y.1978).[5]
Thus, we are convinced that the Court in Buckley did indeed mean exactly what it said when it held that an entity must have “the major purpose” of supporting or opposing a candidate to be designated a political committee. Narrowly construing the definition of political committee in that way ensures that the burdens of political committee designation only fall on entities whose primary, or only, activities are within the “core” of Congress’s power to regulate elections. Buckley, 424 U.S. at 79, 96 S.Ct. 612. Permitting the regulation of organizations as political committees when the goal of influencing elections is merely one of multiple “major purposes” threatens *289 the regulation of too much ordinary political speech to be constitutional.
C.
Given the Supreme Court’s insistence that political committees can only be regulated if they have the support or opposition of candidates as their primary purpose, it is clear that N.C. Gen.Stat. § 163— 278.6(14) is unconstitutional. In this most sensitive of all areas — political speech— North Carolina has produced the same infirmity with its definition of political committee as it did with its attempt to identify communications that were the functional equivalent of express advocacy. See supra, section II. By imposing a political committee designation — and its associated burdens — on entities when influencing elections is only “a major purpose” of the organization, North Carolina not only expands the definition of political committee beyond constitutional limits, but also neglects to provide potentially regulated entities with any idea of how to comply with the law.
As noted earlier, the entire aim of Buckley’s “the major purpose” test was to ensure that all entities subjected to the burdens of political committee designation were engaged primarily in regulable, election-related speech. By diluting Buckley’s test and regulating entities that have the opposition or support of political candidates as merely “a major purpose,” North Carolina runs the risk of burdening a substantial amount of constitutionally protected political speech. A single organization can have multiple “major purposes,” and imposing political committee burdens on a multi-faceted organization may mean that North Carolina is regulating a relatively large amount of constitutionally protected speech unrelated to elections merely to regulate a relatively small amount of election-related speech.
The problems presented by § 163— 278.6(14)’s sweep into constitutionally protected political speech are compounded by the statute’s vagueness. While “the major purpose” of an organization may be open to interpretation, it provides potentially regulated entities with sufficient direction to determine if they will be designated as a political committee. Basically, if an organization explicitly states, in its bylaws or elsewhere, that influencing elections is its primary objective, or if the organization spends the majority of its money on supporting or opposing candidates, that organization is under “fair warning” that it may fall within the ambit of Buckley’s test.[6]
Conversely, § 163-278.6(14) provides absolutely no direction as to how North Carolina determines an organization’s “major purposes.” In addition to influencing elections, NCRL has many other objectives: it disseminates information on pro-life issues; it “work[s] for pro-life alternatives to abortion and humane solutions to the problems of women who seek abortions;” it “foster[s] and encourage[s] public health programs;” it “assist[s] in the establishment of a comprehensive medical, social, and recreational care program for unwed mothers;” and, finally, it “promote[s] anti-poverty pro *290 grams ... directed toward the family unit.” JA 34 (quoting NCRL Articles of Incorporation).
In this sort of setting, it becomes difficult to understand when the “purpose” of supporting or opposing a candidate becomes “a major purpose.” Is a purpose “major” if an organization has only one or two other purposes? Is there a share of total expenditures that determines when a purpose is “major”? An absolute dollar amount? Or perhaps frequency of participation is the relevant criteria: maybe if an organization engages in electoral advocacy three times during one election cycle then the support or opposition of a candidate is “a major purpose”? Given the vagueness of § 163-278.6(14)’s test, it is hard to argue with the plaintiffs contention that, in designating organizations as political committees, North Carolina is essentially handing out speeding tickets without “telling anyone ... the speed limit.” Appellant Reply Brief at 22.
Furthermore, if a board of regulators is to decide when a purpose becomes “a major purpose,” especially on the basis of unannounced criteria, this leaves the application of § 163-278.6(14) open to the risk of partisan or ideological abuse. This is nowhere so dangerous as when protected political speech is involved. Section 163-278.6(14)’s “we’ll know it when we see it approach” simply does not provide sufficient direction to either regulators or potentially regulated entities. Unguided regulatory discretion and the potential for regulatory abuse are the very burdens to which political speech must never be subject.
In fact, North Carolina’s vague definition may create the perverse situation where an entity such as NCRL would have to go through the costly and time-consuming process of disclosing the very information it is attempting to protect in order to fight off a complaint that it is regulable as a political committee. When faced with such a choice, who could blame an organization for deciding not to exercise its right to engage in political speech?
Moreover, narrower means exist for North Carolina to achieve its regulatory objectives. North Carolina is surely right to think that organizations — particularly large organizations — can have a substantial impact on the electoral process even if influencing elections is merely one of them many, “major purposes.” When faced with such organizations, however, North Carolina does not have to impose the substantial burdens of political committee designation to achieve its goal of preventing corruption. Instead, North Carolina could impose one-time reporting requirements— as it already does on certain individual expenditures and contributions by non-political committee organizations, see N.C. Gen.Stat. § 163-278.12 — based on the communication, not the organization. In doing so, North Carolina would produce the same benefits of transparency and accountability while only imposing regulatory burdens on communications that are “unambiguously campaign related.” See Buckley, 424 U.S. at 80, 96 S.Ct. 612.
It is thus clear that North Carolina’s definition of political committee, § 163— 278.6(14), is overbroad and vague. Not only does the statute threaten to regulate organizations primarily engaging in protected political speech, but it also magnifies its overbreadth by providing insufficient direction to speakers and leaving regulators free to operate without even the guidance of discernable, neutral criteria. Furthermore, narrower means exist for North Carolina to achieve its regulatory goals. We therefore hold § 163-278.6(14) to be facially unconstitutional.
*291 IV.
Finally, we consider whether North Carolina can constitutionally apply a $4,000 contribution limit to independent expenditure committees such as NCRL-FIPE.
A.
Section 163-278.13 of North Carolina’s General Statutes places a $4,000 limit on the amount any “individual, political committee, or other entity” can “contribute to any candidate or other political committee” in any given election cycle. N.C. Gen.Stat. § 163-278.13 (2007). In addition, the statute also prohibits all “candidate[s] and political committee[s]” from “accepting] or soliciting] any contribution[s]” over $4,000 in any given election cycle from “any individual, other political committee, or other entity.” Id. As the text of the statute indicates, these $4,000 contribution limits apply to all political committees.
In this case, the plaintiffs challenge § 163-278.13 as applied to political committees, such as NCRL-FIPE, that only make independent expenditures. As stated earlier, independent expenditures are defined as those political expenditures “made without consultation or coordination with a candidate or agent of a candidate whose nomination or election the expenditure supports or whose opponent’s nomination or election the expenditure opposes.” Id. § 163-278.6(9a). The plaintiffs argue that North Carolina’s interest in preventing corruption or the appearance of corruption is insufficient to support such a limit on contributions to committees that only make independent expenditures. This is because “the corruptive influence of contributions for independent expenditures is more novel and implausible than that posed by contributions to candidates.” NCRL II, 344 F.3d at 434.
B.
Again, our analysis starts with the Supreme Court’s decision in Buckley v. Valeo. In Buckley, the Court established what has become one of the foundational principles of its campaign finance jurisprudence: a state may limit campaign contributions if the limits are “closely drawn” and the state demonstrates that the limits support its interest in preventing corruption and the appearance thereof. Buckley, 424 U.S. at 24-29, 96 S.Ct. 612. In the thirty years since Buckley, the Court has consistently affirmed this principle, see, e.g., Nixon v. Shrink Missouri Gov’t PAC, 528 U.S. 377, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000), including most recently in Randall v. Sorrell, 548 U.S. 230, 126 S.Ct. 2479, 2491-92, 165 L.Ed.2d 482 (2006).
Unsurprisingly, the strength of the state’s interest in preventing corruption is highly correlated to the nature of the contribution’s recipient. Thus, the state’s interest in the prevention of corruption' — ■ and, therefore, its power to impose contribution limits — is strongest when the state limits contributions made directly to political candidates. Direct contributions to political candidates run the greatest risk of making candidates “too compliant with the wishes of large” donors, Shrink Missouri, 528 U.S. at 389, 120 S.Ct. 897, providing those donors with “undue influence” over the candidate’s political decisionmaking, NCRL II, 344 F.3d at 433. Given this, the Court has consistently allowed states to apply limits to direct candidate contributions. See, e.g., Shrink Missouri 528 U.S. at 397-98, 120 S.Ct. 897; Buckley, 424 U.S. at 29, 96 S.Ct. 612.
As one moves away from the case in which a donor gives money directly to a candidate, however, the state’s interest in preventing corruption necessarily decreases. This is because the danger that contributions will be given “as a quid pro quo *292 for improper commitments from the candidate” is simply not as real when the candidate himself is removed from the process. Buckley, 424 U.S. at 47, 96 S.Ct. 612.
Of course, some organizations are so closely tied to candidates that the Court has deemed it constitutional for states to apply contribution limits to them. Otherwise, donors could “circumvent” valid contribution limits — and raise fears of corruption — by indirectly funneling money to candidates through political intermediaries. See Fed. Election Comm’n v. Colorado Republican Fed. Campaign Comm., 533 U.S. 431, 456, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001) (“Colorado Republican II ”) (describing “circumvention” as a “valid theory of corruption”). Thus, the Court has held that it is constitutional for states to apply contribution limits to political committees that make contributions directly to candidates. California Med. Ass’n v. Fed. Election Comm’n, 453 U.S. 182, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981) (“Calr-Med ”) (upholding the application of contribution limits to multi-candidate political committees, which accept money from donors and then make direct contributions to political candidates). Since these political committees are “essentially conduits for contributions to candidates,” candidates would be able to easily evade contribution limits by routing large ticket donors to such committees. Id. at 203, 101 S.Ct. 2712 (Blackmun, J., concurring).
The Court has further held that it is constitutional, in certain instances, to apply contribution limits to political parties. See McConnell, 540 U.S. at 144-45, 124 S.Ct. 619 (upholding the application of contribution limits to a federal candidate’s national party and state and local party allies). While contributions made to political parties may not be passed through directly to candidates, the “special relationship and unity of interest” between political parties and candidates makes parties logical “ ‘agents for spending on behalf of those who seek to produce obligated officeholders.’ ” McConnell, 540 U.S. at 145, 124 S.Ct. 619 (quoting Colorado Republican II, 533 U.S. at 452, 121 S.Ct. 2351). In reaching this conclusion, the Court in McConnell highlighted the “ample record” demonstrating both that political parties have embraced their role in facilitating the “widespread circumvention” of federal contribution limits and that “lobbyists, CEOs, and wealthy individuals alike have candidly admitted donating substantial sums” to “secur[e] influence over federal officials.” Id. at 145-47, 124 S.Ct. 619.
Importantly, however, the Court has never held that it is constitutional to apply contribution limits to political committees that make solely independent expenditures. In fact, Justice Blackmun stressed in his Gal-Med concurrence that “contributions to a committee that makes only independent expenditures pose no ... threat” of corruption or the appearance thereof. See Calr-Med, 453 U.S. at 203, 101 S.Ct. 2712 (Blackmun, J., concurring). This makes perfect sense: independent expenditures are made without candidate consultation, rendering it unlikely that such expenditures would be made in exchange for “improper commitments from the candidate.” Buckley, 424 U.S. at 47, 96 S.Ct. 612 (noting that “independent expenditures may well provide little assistance to the candidate’s campaign and indeed may prove counterproductive”).
Moreover, McConnell specifically emphasized the difference between political parties and independent expenditure political committees, which explains why contribution limits are acceptable when applied to the former, but unacceptable when applied to the latter. To begin, the Court noted that independent expenditure com *293 mittees “do not select slates of candidates for elections,” “determine who will serve on legislative committees, elect congressional leadership, or organize legislative caucuses.” McConnell, 540 U.S. at 188, 124 S.Ct. 619. Conversely, “[p]olitical parties have influence and power in the Legislature that vastly exceeds that of any interest group.” Id. Furthermore, “party affiliation is the primary way ... voters identify candidates,” and therefore parties “have special access to and relationships with” those who hold public office. Id. It is thus not ah exaggeration to say that McConnell views political parties as different in kind than independent expenditure committees.
Thus, while the state’s power to impose contribution limits is well-established, that power exists only when the contribution limits are “closely drawn” to the state’s interest in preventing corruption. As the state attempts to regulate entities further and further removed from the candidate, the state interest in preventing corruption necessarily decreases. At the extreme, the entities furthest removed from the candidate are political committees that make solely independent expenditures. As such, it is “implausible” that contributions to independent expenditure political eom-mittees are corrupting. NCRL II, 344 F.3d at 434.
C.
In this case, we find that North Carolina has fallen short of demonstrating that application of its $4,000 contribution limit to independent expenditure political committees furthers its interest in preventing corruption. We thus declare § 163-278.13 unconstitutional as applied to NCRL-FIPE and all similarly situated entities.
Given the remove of independent expenditure committees from candidates themselves, we must require North Carolina to produce convincing evidence of corruption before upholding contribution limits as applied to such organizations. Id. (citing Colorado Republican Fed. Campaign Comm. v. Fed. Election Comm’n, 518 U.S. 604, 618, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996)). Rather than producing convincing evidence, however, North Carolina puts largely the same evidence before this court as it did in NCRL II.[7] In that case, we held that the “state [has] failed to proffer sufficiently convincing evidence” to demonstrate that there is a “danger of corruption due to the presence of unchecked contributions” to indepen *294 dent expenditure political committees.[8] NCRL II, 344 F.3d at 434.
We see no reason to change this determination. McConnell did expand the application of contribution limits to political parties, but, as discussed earlier, it also made clear that independent expenditures do not present a danger of corruption. McConnell, 540 U.S. at 221, 124 S.Ct. 619. In fact, McConnell emphasized that there is little “danger” that independent expenditures “will be given as a quid pro quo for improper commitments from [a] candidate.” Id. (quoting Buckley, 424 U.S. at 47, 96 S.Ct. 612). Since the Supreme Court’s views on the dangers of independent expenditures have not changed, North Carolina’s evidence is still insufficient.
For example, a discussion of “Farmers for Fairness” is probably the primary piece of evidence discussed in North Carolina’s briefing. Appellee Brief at 49-50; JA 313-16. North Carolina claims that the actions of “Farmers” “triggered widespread suspicion of corruption and damaged public confidence in the electoral process,” as “legislators, regulators, the media, civic groups, [and] opinion leaders ... were witnessing firsthand the awesome power of concentrated wealth when it enters the electoral arena.” Id.
“Farmers for Fairness” is an independent expenditure committee that used substantial contributions from “a dozen hog producers and suppliers” to fund advertisements supporting hog industry interests. JA 313. In April 1998, “Farmers” spent over $10,000 a week on issue advocacy targeted at a state representative who had led efforts to increase regulation of the hog industry. Id. That representative was defeated in her primary election, and two of the three other legislators targeted by “Farmers for Fairness” were defeated in the general election. Id. The State also claims that “Farmers” showed legislative leaders their advertisements before they were broadcast, in order to demonstrate to the leaders “the group’s seriousness about impacting the political process.” Id. Finally, North Carolina presents evidence that “Farmers” “discussed” regulatory relief with political party principals, although “no clear quid pro quo could be established.” JA 314.
This evidence does not constitute the type of convincing evidence required to uphold the application of contribution limits to independent expenditure committees. For one, the fact that “Farmers for Fairness” spent money that was successful in convincing voters to oust their targeted candidates can hardly be termed corrup-tive. This fact — alone—simply means that a group felt passionately about an issue and discussed it. After all, one of the primary purposes of political speech is to persuade the electorate. Perchance the message of “Farmers for Fairness” is very much misguided. Those who believe it so should make the case. For the way to counter speech is with opposing speech, *295 not with laws designed to dampen and depress it.
For two, the fact that “Farmers” demonstrated their “seriousness about impacting the political process” is also not evidence of corruption. It goes without saying that it is not a sin to be serious about “impacting the political process”— in fact, the First Amendment is largely about providing every citizen with just that opportunity. If robust advocacy alone is sufficient to demonstrate corruption, the term corruption would cease to have meaning.
Finally, the evidence that “Farmers for Fairness” discussed its ads with legislative leaders does not constitute evidence that contributions to independent expenditure committees are corruptive. If anything, this constitutes evidence that organizations that claim to be independent expenditure committees are, in fact, coordinating their expenditures with candidates. If independent expenditure committees are not in fact independent, they risk forfeiting their exemption from North Carolina’s contribution limits. In such instances, North Carolina is free to apply in a constitutional manner its contribution limits against these purportedly “independent” expenditure committees.
The bottom line is this: independent expenditure political committees do not serve as mouthpieces for political candidates. In fact, such committees do not even coordinate them messages with candidates. Instead, independent expenditure political committees offer an opportunity for ordinary citizens to band together to speak on the issue or issues most important to them. In other words, they allow ordinary citizens to receive the benefits that result from economies of scale in trying to convince the electorate of a political message.
Of course, candidates may be influenced by the impact that such independent expenditures have on the electorate — but this is the entire purpose of allowing free political discourse. As the Supreme Court has said: “The fact that candidates and elected officials may alter or reaffirm their own positions on issues in response to political messages paid for by [political committees] can hardly be called corruption.” Fed. Election Comm’n v. Natl Conservative Political Action Comm., 470 U.S. 480, 498, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985).
In fact, we would go further. Candidates and elected officials altering their positions in response to a political debate is the very essence of democracy. Nothing could be further removed from the spirit of the First Amendment than labeling speech corruptive merely because it is effective. We thus hold § 163-278.13 unconstitutional as applied to independent expenditure political committees such as NCRL-FIPE.
V.
Finally, we address our colleague’s dissenting opinion. The dissent contends we broaden First Amendment protections beyond recognized boundaries in order to “severely restrict [] the well-established power of a state to regulate its elections.” Post at 308. Our decision, the dissent insists, will leave unchecked the “pernicious influence of too much money in politics,” id. (internal quotations omitted), and thereby unleash a parade of horribles on the citizens of North Carolina. See, e.g., id. at 309 (alleging that our decision will “allow many politically active organizations to escape regulation and hide their identities and activities from public scrutiny”); id. at 317 (arguing that our decision will result in “the invalidation of many election regulations that have been carefully draft *296 ed to honor and comply with First Amendment principles, as established by decades of Supreme Court precedent”); id. at 336 (stating that our decision will give organizations “an explicit green light ... to circumvent campaign finance regulation”).
All this, of course, is hyperbolic. We respect without question the state’s legitimate interest in ensuring the integrity of the electoral process. To the extent the state regulates electoral advocacy within the scope of these interests it is well within constitutional bounds. By contrast, it is the dissent’s position that sweeps broadly and portends dramatic consequences. The dissent fails to set forth any meaningful limits on the consignment of our most basic political speech to layer upon layer of intense regulation. One searches the dissent for some end to the reach of regulatory authority, but there is none. Instead, the dissent envisions an order in which the bureaucratic ministries of the state would have nearly unbridled discretion to allow or disallow political messages based, inter alia, on the regulator’s own preferences and predilections.
This is not some marginal or incidental freedom with which the dissent is dealing. Rather it is the essential freedom that defines our ability — both individually and collectively — to speak in unfettered fashion on the most pressing issues of the day, and to express approval or disapproval of the functioning of our representative government. New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), noted our “profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.” The Court has long made clear that political speech is “indispensable to decisionmaking in a democracy,” and that the courts play a critical role in its protection. First Nat’l Bank of Boston v. Bellotti, 435 U.S. 765, 777, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978).
For the regulator’s hand, once loosed, is not easily leashed. The Code of Federal Regulations, or its state equivalent, is no small thing. It is no unfounded fear that one day the regulation of elections may resemble the Internal Revenue Code, and that impossible complexity may take root in the very area where freedom from intrusive governmental oversight should matter most. For while appropriate regulation may serve good and useful purposes in many areas, the Constitution makes clear that excessive regulation of political speech is suspect.
Campaign finance regulation has been termed “baffling and conflicted.” Majors v. Abell, 361 F.3d 349, 355 (7th Cir.2004). It is an area in which speakers are now increasingly forced to navigate a maze of rules, sub-rules, and cross-references in order to do nothing more than project a basic political message. Only those able to hire the best team of lawyers may one day be able to secure the advisory opinions, see N.C. GemStat. § 163-278.23 (2007), or otherwise figure out the myriad relevant rulings with any degree of assurance that they will escape civil and criminal sanctions for their speech. See, e.g., id. § 163-278.27 (imposing a Class 2 misdemeanor for violation of campaign finance laws); id. § 163-278.34 (imposing various civil penalties, including fines, for failure to comply with campaign finance laws). The Supreme Court has warned against exactly this. See WRTL, 127 S.Ct. at 2666 (citing Virginia v. Hicks, 539 U.S. 113, 119, 123 S.Ct. 2191, 156 L,Ed.2d 148 (2003)).
North Carolina’s regulations do not meet basic First Amendment requirements. Instead, they set out vague standards that empower administrators to burden core political expression (N.C.Gen. Stat. §§ 163-278.14A(a)(2) & 163- *297 278.6(14)) and regulate beyond the periphery of any plausible state interest in preventing corruption (N.C.Gen.Stat. § 163-278.13). To uphold these regulations is to usher in a regime in which the winners are ungovernable complexity, the state enforcement apparatus, and the experts in the arcana of election law whose fees will increasingly make affluence a prerequisite for many forms of political participation. The losers, sadly, will be persons of all points of view who wish only to engage in robust political discussion.
A.
The dissent initially contends that we err by invalidating North Carolina’s “context prong” for identifying speech that “support[s] or oppose[s] the nomination or election of one or more clearly identified candidates.” See N.C. Gen.Stat. § 163— 278.14A(a)(2) (2007). In particular, the dissent alleges that we have declared a statute overbroad when it would unconstitutionally regulate pure political speech only in “rare instances,” and vague when it provides “particularly clear direction to both speakers and regulators.” Post at 326, 318.
1.
The dissent commits several errors in evaluating the constitutionality of § 163-278.14A(a)(2). To begin, the dissent virtually ignores the import of FEC v. Wisconsin Right to Life, Inc.,—U.S.-, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007), the Supreme Court’s most recent decision addressing the issues in this case. In fact, the dissent goes so far as to suggest that WRTL has no “relevan[ce]” or meaning for major areas of campaign finance law. See post at 325.
I find this dismissiveness unfortunate. To say that WRTL is “not relevant” outside the realm of expenditure requirements, see id., is to say that other campaign finance regulations — however vague and overbroad — pose no danger to political speech. Given its plain application and unquestioned relevance, it is simply wrong for the dissent to give WRTL such short shrift. Indeed, the dissent fails even to recognize that WRTL sought to limit and confine the definition of the “functional equivalent of express advocacy” in order to prevent state regulation from vitiating political speech. See id. at 314-15.
Specifically, WRTL only allows political speech to be regulated if it both “meets the brightline requirements of BCRA § 203” and “is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate.” See WRTL, 127 S.Ct. at 2669 n. 7, 2667. The dissent never claims that § 163— 278.14A(a)(2) meets this standard, nor can it: as discussed earlier, North Carolina’s “context prong” sweeps far more broadly than WRTL’s “functional equivalent of express advocacy” test. See supra at 282-85.
The “context prong,” as noted, is intended to regulate “communications whose essential nature expresses electoral advocacy.” Section 163-278.14A(a)(2) resorts to “contextual factors” to identify a communication’s “essential nature” when and “[i]f the course of action is unclear.” N.C. Gen.Stat. § 163-278.14A(a)(2) (2007) (emphasis added). This last is nothing short of an explicit confession from the statute itself of its fatal vagueness and over-breadth. Despite the fact that “the benefit of the doubt” must be given to speech, rather than censorship, see WRTL, 127 S.Ct. at 2674, North Carolina’s “context prong,” when faced with uncertainty, subjects speech to more scrutiny and possible regulation. This is patently unconstitutional: “[wjhere the First Amendment is *298 implicated, the tie goes to the speaker, not the censor.” Id. at 2669.
Furthermore, North Carolina simply compounds the constitutional infirmities by using “contextual factors” in a misguided attempt to bring clarity to § 163-278.14A(a)(2)’s quixotic search for a communication’s “essential nature.” As stated earlier, WRTL expressly rejects the constitutionality of the “ ‘open-ended rough- and-tumble of factors’ ” as a means of identifying regulable electoral advocacy or its functional equivalent, since such factors invariably burden speech by “ ‘invit[ing] complex argument in a trial court and a virtually inevitable appeal.’ ” WRTL, 127 S.Ct. at 2666 (quoting Jerome B. Grubarb, 513 U.S. at 547, 115 S.Ct. 1043). In other words, WRTL emphatically rejects the resort to a multi-factored, totality of the circumstances approach for defining regulable electoral advocacy. In stark contrast, North Carolina has explicitly adopted just such a test. This is squarely at odds with the clear direction offered by the Supreme Court, and as a lower court we are bound to follow the Court’s instructions. Doing otherwise will set both the inferior federal courts and the states themselves on a dangerous path.
The dissent claims that we “simply misread[ ] WRTL ” in forbidding the use of factors, since nothing in WRTL forbids “the consideration of context.” Post at 321-22. But it is the dissent that misreads WRTL. The problem with § 163— 278.14A(a)(2)’s use of “contextual factors” is not the consideration of context (which is, indeed, inevitable in such an objective inquiry), but rather the use of factors. As discussed earlier, see supra at 283, the “contextual factors” listed in § 163— 278.14A(a)(2) are nothing if not a lexicon of bureaucratic empowerment, and an invitation to endless litigation during which the speaker is left at sea.
In order to demonstrate this, it bears repeating the “contextual factors” referenced in the statute: “the language of the communication as a whole, the timing of the communication in relation to the events of the day, the distribution of the communication to a significant number of registered voters for that candidate’s election, and the cost of the communication.” N.C. GemStat. § 163-278.14A(a)(2) (2007). Nebulous terms do not “assist[ ]” regulators by providing “direction” as the dissent suggests, see post at 319; they further muddy the waters. North Carolina’s loose mélange of factors do not elucidate WRTL’s objective test; instead, they present the very infirmity identified by WRTL, namely, that of supplying regulators with nearly endless possibilities for discovering whether a communication can “only be interpreted by a reasonable person as advocating the nomination, election, or defeat of that candidate in that election.” N.C. Gen.Stat. § 163-278.14A(a)(2), (2007). Consider, for example: what are the significant “events of the day”? How many days are sufficient for a communication to escape being “relat[ed]” by “timing” to the “events of the day”? What is a “significant number” of voters? The “context prong” provides no answers to these or other questions, and instead threatens to regulate large quantities of pure political speech.
The dissent contends that we incorrectly use the “brightline requirements of BCRA § 203” as a “rigid” test for overbreadth. Post at 315-16. To the contrary, we use the BCRA definition to illustrate just how incredibly far the contextual definition in this case has broadened the scope of electoral advocacy from what was approved in McConnell. Indeed, BCRA § 203 only regulates communications that refer to specific individuals (“clearly identified candidates”) at specific times (thirty days be *299 fore a primary and sixty days before a general election) and reach at least a specific number of people (50,000 in the district or state the candidate seeks to represent). By contrast, § 163-278.14A(a)(2) determines whether communications are regulable by divining their “essential nature” (which the statute itself admits is “unclear”) from a set of vague and undefined “contextual factors.” Compare BCRA, 116 Stat. 91, 2 U.S.C. § 434(f)(3)(A)(i), (C) (2000 ed. & Supp. IV) with N.C. Gen.Stat. § 163-278.14A(a)(2) (2007). The two approaches are different in kind, and the latter, therefore, is hardly a suitable substitute for the former as a means to identify the “functional equivalent of express advocacy.”
And even if the dissent is correct and WRTL did not intend to mandate the specific dictates of BCRA § 203 as a necessary prerequisite for functional equivalency, it is inconceivable that the Supreme Court would ever allow a state to substitute a test as vague and broad as this “context prong” as an alternative standard. For even a cursory reading of § 163— 278.14A(a)(2) uncovers its serious constitutional infirmities — infirmities the dissent has failed to acknowledge, much less address.
In fact, the dissent is unable to identify a single case that has upheld a definition of the “functional equivalent of express advocacy” as broad as § 163-278.14A(a)(2) since the Supreme Court’s WRTL decision. Instead, the dissent points to three cases that specifically address BCRA, see Citizens United v. Fed. Election Comm’n, 530 F.Supp.2d 274, 276-77 (D.D.C.2008); Shays v. Fed. Election Comm’n, 508 F.Supp.2d 10 (D.D.C.2007); Fed. Election Comm’n v. Kalogianis, No. 8:06-cv-68-T-23EAJ, 2007 WL 4247795 (M.D.Fla. Nov.30, 2007), and two cases that address statutes containing none of the infirmities discussed above, see Cal. Pro-Life Council, Inc. v. Randolph, 507 F.3d 1172, 1180-83 (9th Cir.2007); Voters Educ. Comm. v. Wash. State Public Disclosure Comm’n, 161 Wash.2d 470, 166 P.3d 1174, 1180 (2007). None of these cases contains a definition of regulable electoral advocacy that is remotely as overbroad and indeterminate as the enactment before us.
Indeed, the dissent does not quote from any of the statutes at issue in any of those cases for a very good reason: most follow BCRA, and all avoid such phrases as “if the course of action is unclear,” “the timing of the communication in relation to the events of the day,” and “the distribution of the communication to a significant number of registered voters.” It is thus plain that § 163-278.14A(a)(2) does not provide a constitutionally adequate test for express advocacy or its functional equivalent, and is thus substantially vague and overbroad.
Moreover, despite the dissent’s arguments to the contrary, the fact that “a potential speaker may seek further guidance” in the form of “a binding advisory opinion,” does not fix § 163-278.14A(a)(2)’s multiple constitutional infirmities. Post at 319-20. If states were able to address a statute’s breadth and lack of clarity simply by adding another layer to their regulatory apparatus, the overbreadth and void for vagueness doctrines would be a dead letter. Simply put, the ability to engage in political speech cannot be made into a matter of repetitive supplication.
Despite this, the dissent accuses us of failing to perform a “proper overbreadth analysis” that takes into account the various “type[s] of regulations implicated” by § 163-278.14A(a)(2). Id. at 316, 322-25. According to the dissent, the burdens imposed on political speech and the state’s interests may vary by the type of regulation, and, therefore, analyzing § 163-278.14A(a)(2) regulation by regulation *300 demonstrates that it is only unconstitutional in “rare” applications, and thus not facially overbroad. Id. at 325-27. The dissent would thus have us uphold § 163-278.14A(a)(2) in full and wait to consider the constitutionality of each of its applications in an as-applied fashion.
Even if the dissent were correct that the scope of regulable speech may vary slightly based on regulation type, this does not mean that a patently overbroad definition like § 163-278.14A(a)(2) acquires a halo of constitutionality when the context shifts. Speakers are going to have to contend with this same definition and its same infirmities for both expenditures and contributions, regardless of whether the regulatory context is one of disclosure, reporting, or limitation. There is simply no reason to subject speakers to such an imposition when a statute explicitly announces that its own “unclear” definition threatens the regulation of protected speech, and when other overbroad “contextual factors” doubly and triply compound the problem.
If we decided to proceed incrementally in an as-applied fashion, as the dissent suggests, it would require protracted litigation to sort through all of the “context prong’s” uncertain and problematic applications. During this time, speech would be at the leave of bureaucratic discretion and potentially subject to bewildering and inconsistent rulings and decisions: the very blueprint for chilling political discussion. Speakers must not be put in “ ‘circumstances wholly at the mercy of the varied understanding of [their] hearers,’ ” in this case regulators hypothesizing about some hypothetical audience. Buckley, 424 U.S. at 43, 96 S.Ct. 612 (quoting Thomas v. Collins, 323 U.S. 516, 535, 65 S.Ct. 315, 89 L.Ed. 430 (1945)). Faced with such prospects, many speakers, “rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech— harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas.” Hicks, 539 U.S. at 119, 123 S.Ct. 2191 (citing Dombrowski v. Pfister, 380 U.S. 479, 486-87, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965)).
The dissent argues that the Supreme Court’s recent decision in Washington State Grange v. Washington State Republican Party,—U.S.-, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008), offers more proof that facial challenges are disfavored in the First Amendment context. See post at 311-12, 340-41, 341. Washington State Grange, of course, is about primary design and access, not the financing of political campaigns. See 128 S.Ct. at 1187-89. It involves a different set of constitutional interests: the associational rights of political parties, rather than the individual right to the freedom of political speech. See id. at 1189-90. In fact, Washington State Gn°ange does not so much as reference Buckley, McConnell or WRTL (or for that matter any other campaign finance case) even once. If the Supreme Court wanted to establish a sweeping new approach to evaluating campaign finance cases in Washington State Grange, it would at the very least have alluded to its own decisional law.
Moreover, the Court took pains to except the situation before us in this case — a challenge to a statute’s overbreadth and vagueness — from its holding in Washington State Gmnge. Recognizing the different constitutional interests at stake in an overbreadth challenge, the Court in Washington State Grange held that a challenge to a statute’s overbreadth was a “second type of facial challenge” different than the one presented in Grange. See Grange, 128 S.Ct. at 1190 n. 6. The Court then stated that the facial standard for overbreadth *301 (“a substantial number of [a statute’s] applications are unconstitutional”) is less onerous than the facial standard applied in Grange (“a plaintiff can only succeed in a facial challenge by establishing that no set of circumstances exists under which the Act would be valid”). Id. at 1190 & n. 6 (internal quotations omitted). In fact, the Court in Washington State Grange used the exact same “strong medicine” language we do in describing the appropriate standard for facial overbreadth challenges. See id. at 1190 n. 6 (internal quotations omitted).
To understand substantial overbreadth in this area, we need look no further than the Supreme Court’s own decisions. As noted, the Court has made clear that, in order to avoid overbreadth concerns, campaign finance statutes must both conform to BCRA § 203 and avoid the “rough-and-tumble” of multi-factored tests. See WRTL, 127 S.Ct. at 2666, 2669 n. 7. North Carolina’s “context prong” does neither. It is thus unconstitutional. We hardly need speculate, as the dissent terms it, on the overbroad applications of N.C. Gen. Stat. § 163-278.14A(a)(2). See post at 340 (quoting Grange, 128 S.Ct. at 1190). The statute is substantially overbroad under the Supreme Court’s own explicit terms.
Thus, while we recognize that WRTL involved an as-applied challenge, that does not mean that the entire holding and reasoning of that decision is without any facial implications. The Constitution does not require that we go application by application, case by case, month by month, year after year to eradicate the very infirmities the Supreme Court warned against and insisted we avoid.
2.
To conclude, we address the dissent’s concern that our decision invalidates “many election regulations,” allowing “organizations and individuals to conceal their identities, spend unlimited amounts on campaign advertising masked as discussion of issues, and ‘hide themselves from the scrutiny of the voting public.’ ” Post at 317, 308 (quoting McConnell, 540 U.S. at 197, 124 S.Ct. 619).
The dissent’s concerns are overblown. While we do indeed invalidate N.C. Gen. Stat. § 163-278.14A(a)(2) as impermissibly vague and substantially overbroad, North Carolina remains free to enforce all campaign finance regulations that incorporate the phrase “to support or oppose the nomination or election of one or more clearly identified candidates.” See N.C. Gen.Stat. § 163-278.14A(a) (2007). And, while the dissent apparently contends that our decision makes it impossible for North Carolina to draft a constitutional context prong, see post at 319-20, North Carolina remains free to adopt a definition of express advocacy consistent with the standards approved by McConnell and WRTL. Furthermore, we leave the core of the state’s regulatory power in this area untouched: for example, the state is still free to regulate contributions to political campaigns, and to impose reporting and disclosure requirements on political campaigns and other entities historically considered to be political committees. We simply hold that North Carolina cannot rely on the overbroad and vague “context prong.”
North Carolina has tasked its State Board of Elections with broad responsibilities and granted it far-reaching powers to achieve its goals. The State Board is directed to investigate any potential violation of North Carolina’s election laws. See N.C. Gen.Stat. § 163-22(d) (2007). In order to perform these investigations, the chairman of the Board has the “power to administer oaths, issue subpoenas, summon witnesses, and compel the production *302 of papers, books, records and other evidence.” Id. § 163-23. And if the Board has “reason to believe there has been a violation” of North Carolina’s campaign finance laws, it can direct “the appropriate district attorney” to “prosecute the individuals or persons alleged to have violated” North Carolina’s election laws. Id. § 163-278.27.
The danger in this area — when dealing with a broadly empowered bureaucracy— is not that speakers may disguise electoral messages as issue advocacy, but rather that simple issue advocacy will be suppressed by some regulator who fears it may bear conceivably on some campaign. If the First Amendment protects anything, it is the right of political speakers to express their beliefs without having to fear subsequent civil and criminal reprisals from regulators authorized to employ broad and vague definitions as they see fit. See Buckley, 424 U.S. at 43, 96 S.Ct. 612 (quoting Thomas, 323 U.S. at 535, 65 S.Ct. 315).
Of course, the dissent is right to point out that our decision may enable speakers to more easily influence elections using issue advocacy. See post at 308. But that is no affront to democracy. In fact, the only way to stop political speech from ever influencing the outcome of elections would be to ban it entirely. For, as the Supreme Court has just noted, the very purpose of political speech is to provide people with “information” about important issues so that they can make informed “voting decisions.” See WRTL, 127 S.Ct. at 2667; see also Thornhill v. Alabama, 310 U.S. 88, 101-02, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).
The answer to avoidance of political speech restrictions is not invariably more political speech restrictions, or an increase in the breadth, depth, and complexity of the state’s regulatory apparatus. There is no end in sight to that approach, nor does the dissent so much as suggest one. At some point — a point reached far before the substantial and unprecedented over-breadth of § 163-278.14A(a)(2) — enough is simply enough. See WRTL, 127 S.Ct. at 2672.
B.
The dissent next takes issue with our analysis of North Carolina’s political committee definition. Under North Carolina law, four types of entities can be labeled political committees: candidate-controlled committees; political parties or their affiliates; corporations or other business and professional groups, including unions; and, finally, any entity that “[h]as as a major purpose to support or oppose the nomination or election of one or more clearly identified candidates.” N.C. Gen.Stat. § 163-278.6(14) (2007). Only the last of these entities is in any way at issue. The dissent contends that we err in holding this last portion of the political committee definition — the “a major purpose” test— unconstitutionally vague and overbroad. See post at 326-28.
As an initial matter, the dissent would have us decline to follow the very language used not only by Buckley v. Valeo, but also by numerous other cases as well. See supra at 287-88. But, just as we observed with respect to the treatment of WRTL, declining to follow the Supreme Court is not an option. Buckley explicitly states that political committee regulations “can cover groups ‘the major purpose of which is the nomination or election of a candidate.’ ” Post at 326 (quoting Buckley, 424 U.S. at 79, 96 S.Ct. 612) (emphasis omitted). If this is Buckley’s formulation, then it must be ours, and the question is why it is not the dissent’s as well.
*303 Despite Buckley’s clear mandate, the dissent argues that North Carolina is not required to “rigidly adhere” to “the major purpose” test. Post at 326-27. According to the dissent, North Carolina’s “a major purpose” standard is sufficiently clear to provide direction to political speakers, see id. at 327-29, and “careful not. to frustrate issue advocacy or general political speech,” id. at 332.
This view fails to appreciate the difference between the definite and indefinite articles in this context. The dissent contends that “North Carolina’s ‘a major purpose’ test is just as clear as a ‘the major purpose’ test to both speakers and regulators.” Id. at 329. Likewise, the dissent contends that “the substitution of ‘a’ for ‘the’ in Buckley’s major purpose test does not expand the reach of the Act in any way that overly burdens First Amendment freedoms.” Id. With these arguments, however, the dissent simply ignores the fact that, under North Carolina’s “a major purpose” approach, an organization can have multiple “major purposes,” while under the Supreme Court’s “the major purpose” approach, an organization can have but one “major purpose.” The constitutional importance of this distinction is self-evident.
To begin, although there may be disputes in rare circumstances, organizations and regulators should agree on an organization’s foremost or “primary” purpose. MCFL, 479 U.S. at 262, 107 S.Ct. 616. Conversely, North Carolina’s “a major purpose” standard leaves the “line between innocent and condemned conduct ... a matter of guesswork.” Laurence H. Tribe, American Constitutional Law § 12-31, at 1033 (2d ed.1988). This is particularly true because North Carolina provides absolutely no statutory direction as to when a “purpose” becomes “a major purpose” in a multi-faceted organization like NCRL. See supra at 290. Is it based on the number of purposes? The money spent on each? The frequency of electoral participation? The statute does not provide notice as to which of these standards apply; this, of course, means that regulators will once again be empowered to make these judgments to the maximum conceivable extent.
Moreover, under North Carolina’s “a major purpose” standard, organizations can be subjected to regulation as a political committee even if the majority of their activity is not election related. Since political committee burdens apply across the board to all of an organization’s activities, this means that, under § 163-278.6(14), substantial amounts of pure political speech will be burdened in an effort to regulate relatively minor amounts of electoral advocacy. The dissent is well aware of this. In fact, it readily admits that “most organizations — including NCRL— do not have just one major purpose.” Post at 330. But the dissent thinks North Carolina’s “a major purpose” standard is appropriate regardless, since it enables the regulation of organizations “heavily focused on electoral advocacy” — that is, organizations that spend “forty-five percent of [their] resources on lobbying and forty-five percent of [their] resources on supporting or opposing specific candidates.” Id.
Of course, the dissent’s stylized example does not address the organization that has four equally important purposes, only one of which is electoral advocacy. Nor does it consider the organization that has seven equally important purposes. Or ten. But under North Carolina’s “a major purpose” standard, each of these organizations could be subjected to regulation just as surely as the dissent’s hypothetical example. The dissent simply never addresses the plain fact that performing our duty to follow *304 Buckley's, “the major purpose” standard is the only way to ensure that political committee burdens fall primarily on electoral advocacy. See supra at 288-89.
The dissent also underestimates the burdens attendant to designation as a political committee. The dissent claims that North Carolina’s political committee requirements “impose only marginal restrictions on speech.” Post at 329. This belies both the precedent of this circuit — which has termed “the consequences” of being labeled a political committee “substantial,” NCRL I, 168 F.3d at 712 — -and the actual nature of the obligations. We have detailed earlier in this opinion the welter of regulations placed on political committees under North Carolina law. See supra at 291-92. Political committees must, inter alia, appoint a treasurer to be trained by the State before every election cycle, see N.C. Gen.Stat. § 163-278.7 (2007), abide by contribution limits, see id. §§ 163— 278.13, and comply with time-consuming disclosure requirements that allow the state to scrutinize them affairs, see, e.g., id. §§ 163-278.9. These requirements are more than just nuisances, and indeed are precisely the sort of burden that discourages potential speakers from engaging in political debate. See Buckley, 424 U.S. at 64-65, 96 S.Ct. 612.
Finally, the dissent is too quick to discount the possibility that North Carolina can achieve its regulatory objectives through less restrictive means. The dissent does not contest the fact that onetime reporting requirements of contributions and expenditures will produce many of the same benefits of accountability and transparency as the more onerous political committee designation. Nonetheless, the dissent still finds this less burdensome alternative too “tepid” and “minimalist.” Post at 331. This is because one-time requirements do not “enable the state” to either “undertake prompt investigation of incidents of potential misconduct” or “limit[] extremely large contributions to organizations that then spend that money on direct electoral advocacy.” Id.
Neither of the dissent’s concerns carry the day, however. The mere possibility that an organization may “potentially” engage in misconduct is not a sufficient reason to regulate large quantities of political expression. Hypothetical harms do not justify infringement on First Amendment freedoms. See, e.g., Edenfield v. Fane, 507 U.S. 761, 770-71, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993). Likewise, the dissent does not recognize that “large contributions” given to organizations with only “a major purpose” of influencing elections will more likely than not be used to fund protected First Amendment activities. This is hardly the sort of tailoring required in this most sensitive of areas. See, e.g., McIntyre v. Ohio Elections Comm’n, 514 U.S. 334, 347, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995).
The dissent’s analysis of North Carolina’s political committee definition thus mirrors its analysis of the “context prong.” Dissatisfied with regulatory options that conform to clear Supreme Court precedent, the dissent writes North Carolina what is, in essence, a blank check to trample on protected political speech.
C.
The dissent finally contends that we err by striking “down [North Carolina’s] $4,000 contribution limit insofar as it applies to ‘independent expenditure political committees’ such as NCRL-FIPE.” Post at 332. The dissent claims that we “improperly” discount the “substantial evidence of the corruptive influence of independent expenditures” that North Carolina has produced. Id. at 337. According to the dissent, this evidence is “sufficient” to *305 justify the application of § 163-278.13 to independent expenditure committees. Id. at 334.
The specific evidence discussed by the dissent, however, does not constitute the type of proof necessary to warrant the regulation of pure political expression. In particular, the dissent discusses three pieces of evidence: (1) an expert declaration concerning how, in the 2004 federal campaigns, national parties routed large-ticket donors toward independent expenditure committees that were able to “ ‘effectively aid a campaign without any formal coordination,’ ” id. at 335 (quoting JA 325); (2) the previously discussed Farmers for Fairness advertising campaign “directly opposing certain legislative candidates,” post at 335; and, finally, (3) general evidence of “actual corruption in North Carolina politics,” id. at 336 n. 11.
This evidence does not support the conclusion that independent expenditure committees are corrupting North Carolina politics. The only evidence the dissent presents on the actual use of independent expenditure committees to circumvent contribution limits involves national parties and federal elections. Indeed, the dissent presents no evidence specific to North Carolina linking either the systematic circumvention of contribution limits or quid pro quo corruption to independent expenditure committees.
In fact, it is worth pausing on the evidence the dissent does present concerning North Carolina politics in order to demonstrate its insufficiency. Although the dissent discusses a single independent expenditure committee, Farmers for Fairness, at length, the dissent never once even alleges that the Farmers coordinated their expenditures with candidates or engaged in traditional quid pro quo corruption. Instead, the dissent finds it sufficient that the Farmers proposed to run ads that took issue with incumbent legislators on positions “unrelated” to “its central issue, deregulation of the hog industry.” Id. at 335.
It is difficult to see how these facts support the regulation of independent expenditure committees. The fact that such committees may find it worthwhile to support issues other than their primary focus hardly constitutes corruption or even the appearance thereof. Likewise, we see no harm in using pure political speech in an attempt to achieve legislative ends.
Our disagreement with the dissent on this latter point is fundamental. The dissent’s vague assertion of intimidation simply does not support the regulation of pure political speech. Political speakers have every right to make incumbents answer for their record. Legislators are not without their bully pulpit, and incumbents are not without their fundraising and name-recognition advantages. It is virtually unassailable that political speech is as necessary for political challengers as for sitting legislators, and the dissent simply pays no heed to the fact that the regulation of political speech can very easily serve as a front for incumbency protection. See Randall v. Sorrell, 548 U.S. 230, 126 S.Ct. 2479, 2492-94, 165 L.Ed.2d 482 (2006). “The first instinct of power is the retention of power, and, under a Constitution that requires periodic elections, that is best achieved by the suppression of electiontime speech.” McConnell, 540 U.S. at 263, 124 S.Ct. 619 (Scalia, J., dissenting). The appropriate legislative response to potentially effective speech from organizations like the Farmers for Fairness is not to silence them through regulation, but rather to appeal to the electorate with effective counter-speech. See Whitney v. California, 274 U.S. 357, 377, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandéis, J., concurring) (stating that the appropriate “reme *306 dy to be applied” to objectionable speech “is more speech, not enforced silence”).
The dissent’s other evidence specific to North Carolina consists of “examples of actual corruption in North Carolina politics.” Post at 336 n. 11. According to the dissent, the fact that politicians in North Carolina have engaged in corruption “support[s] the state’s reasonable prediction that state politicians and contributors will likely find and exploit any existing loopholes in campaign finance regulations.” Id. This evidence is similarly unpersuasive: general evidence of corruption hardly justifies the specific regulation of independent expenditure committees. In fact, some may argue that free political speech is the best remedy for, rather than a cause of, corruption. Indeed, independent expenditure committees may be the very ones to take up the lance against corrupt public practices. By embracing ever greater burdens upon political speech, the dissent is slowly ridding our democracy of one of its foremost cleansing agents. See, e.g., Mills v. Alabama, 384 U.S. 214, 218, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966) (noting that “there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs”).
Finally, we address the dissent’s final argument: that the corporate structure of NCRL, NCRL-PAC, and NCRL-FIPE justifies application of North Carolina’s contribution limits to independent expenditure committees. According to the dissent, our decision allows interlocked organizations that share management (like NCRL and its affiliates) to “circumvent campaign finance regulation” by coordinating with candidates through political committees (e.g., NCRL-PAC), while accepting large-ticket donations to independent expenditure committees (e.g., NCRL-FIPE). Post at 336.
While we recognize the theoretical risk of abuse in this area, the dissent’s argument is at least two steps away from justifying across-the-board application of contribution limits to independent expenditure committees. First, as discussed earlier, there is no evidence in the record that NCRL has abused its corporate form. See supra at 294 n. 8. Second, even if there was evidence that NCRL was using NCRL-FIPE to circumvent North Carolina’s contribution limits, this would hardly be sufficient justification to regulate all independent expenditure committees. Such committees would be judged guilty with no chance of proving their innocence, while the state neglected the use of a more narrowly tailored regulatory option: applying contribution limits to independent expenditure committees shown to have abused their corporate form.
D.
Our colleague in dissent charges that “[i]t is not our place to rewrite precedent, even if our beliefs about the First Amendment conflict with those of the Supreme Court.” See post at 340. Surely this suggestion must have occasioned introspection. For it is the dissent which has contravened no fewer than three Supreme Court precedents in a single action. It seeks to uphold the very multi-factor test that WRTL said emphatically should not be upheld. It seeks to sustain a statute unprecedented in its lack of clarity against a vagueness challenge, even though the statute extends far beyond the specific set of requirements the Supreme Court approved in McConnell. And, finally, the dissent rejects the exact formulation used by Buckley and its progeny to define political committee in a manner that infringes least substantially on political speech. While it is assuredly true that courts of appeal enjoy interstitial latitude in inter *307 preting Supreme Court decisions, we do not possess the authority to set them aside. That is the plain effect of what is urged by the dissent, and it would only add to the problems and uncertainties besetting this area.
The dissent further disregards Supreme Court precedent by inventing a First Amendment standard out of whole cloth. The dissent concedes that North Carolina’s regulations “may affect speech,” but refuses to declare the statutes unconstitutional because they “do not silence” speech. Post at 339; see also id. at 338. This “silencing” standard is no friend of the First Amendment. Indeed, the dissent’s surmise about the quantum of political speech lost to North Carolina’s over-broad campaign finance regulations is nothing more than guess-work. With its new “silencing” standard, the dissent suggests that political speech must be placed in some meat locker before First Amendment implications arise. This is not how we understand the First Amendment, because it gives the benefit of every doubt to regulatoi'y censorship.
In fact, the dissent seems to be unaware of the risks presented to free political speech by empowering state actors with vague and broad statutes. The dissent claims that “[d]ecades of campaign finance regulation have not silenced political speech.” Id. at 338. While this is a matter of opinion, not evidence, it hardly helps the dissent, for political debate in this country has never had to navigate regulations as vague and overbroad as those before us in this case.
The dissent, however, does make its own overbroad assertions about the effect this opinion will have on the place of money and the level of transparency in politics, see post at 340-41; yet, in doing so, it ignores the limited nature of our holding, which we have emphasized throughout. We repeat that the important task of ensuring electoral integrity leaves considerable room to regulate within constitutional bounds. We repeat also that North Carolina remains free to, inter alia, impose disclosure and reporting requirements on political candidates and committees, so long as it does so in accordance with WRTL and McConnell. North Carolina is also free to regulate all traditional political committees — for example, those controlled by candidates, political parties, or those created by corporations and unions. See N.C. GemStat. § 163-278.6(14)(a)-(c) (2007). But the legislation challenged in this case represents a giant step beyond these Supreme Court decisions. The state here seeks to expand its control so that it may regulate not only electoral advocacy, but pure political speech, as well.
Debate on political issues can be reasoned and calm. It can also be passionate, long-winded, funny, uplifting, dull, or downright outrageous. Whatever it is, speakers ought to be able to engage in it without wondering all the while whether a regulator now possessed of unprecedented discretion will find they have committed the mortal sin of uttering “the functional equivalent of express advocacy.” Our dissenting colleague would permit the state to oversee political speech — no questions asked. The dissent would force political speech to navigate the Scylla of vagueness and all its chilling effects and the Charybdis of impossibly intricate regulation, which even the cognoscenti may be unable to divine. Indeed, the dissent replaces the Supreme Court’s faith in the workings of the First Amendment with a faith in the powers of government to manage what we say on what matters most. This approach surrenders to the state an awesome control over those political issues that determine the quality of our democracy and the *308 values that give purpose and meaning to our lives.
VI.
To summarize our decision: we hold North Carolina’s statutory attempt to use context to identify communications in support of or opposition to a candidate, N.C. GemStat. § 163-278.14A(a)(2), facially unconstitutional; North Carolina’s use of “a major purpose” test to identify political committees, N.C. Gen.Stat. § 163— 278.6(14), amended by N.C. Sess. Laws 2007-391, facially unconstitutional; and North Carolina’s $4,000 contribution limit, N.C. Gen.Stat. § 163-278.13, unconstitutional as applied to NCRL-FIPE and other similarly situated entities. The decision of the district court is thus

AFFIRMED IN PART AND REVERSED IN PART.

. The two other statutes challenged by the plaintiffs, N.C. Gen.Stat. § 163-278.12A and N.C. Gen.Stat. § 163-278.39(a)(3), have been repealed. Therefore, these challenges are moot. See North Carolina Right to Life, Inc. v. Leake, 482 F.Supp.2d 686, 697-98 (E.D.N.C.2007).

. We agree with the district court's determination that the plaintiffs have standing to pursue their claims. North Carolina law makes it a misdemeanor to "intentionally violate!]” various North Carolina campaign finance statutes, including the contribution limit at issue in this case and several provisions triggered by North Carolina’s definitions of political committee and electoral advocacy. See N.C. Gen.Stat. § 163-278.27 (2007).
As we held in NCRL I, when a "plaintiff faces a credible threat of prosecution under a criminal statute he has standing to mount a pre-enforcement challenge to that statute.” NCRL I, 168 F.3d at 710. A statute that " ’facially restrict[s] expressive activity by the class to which the plaintiff belongs’ presents such a credible threat,” id. (quoting New Hampshire Right to Life PAC v. Gardner, 99 F.3d 8, 15 (1st Cir.1996)), particularly if it threatens to "chill the exercise of First Amendment rights,” NCRL I, 168 F.3d at 710. Since the statutes challenged by the plaintiffs threaten to subject them to prosecution, and the plaintiffs are therefore "chilled” from engaging in potentially protected First Amendment political expression, standing exists in this case.

. We reject North Carolina's argument that the first sentence of § 163-278.14A(a)(2) is merely an “explicative definition of express advocacy,” and therefore constitutional under Federal Election Commission v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (‘‘MCFL’’). As this court noted in NCRL II, the Supreme Court in MCFL did look to the " 'essential nature' of a communication in determining whether it constituted "electoral advocacy.” NCRL II, 344 F.3d at 425 n. 2. However, the MCFL Court focused on "actual words of advocacy,” and § 163-278.14A(a)(2) is not limited to the plain language of a communication in such a fashion. Id. This court in NCRL II thus stated that the first sentence of § 163-278.14A(a)(2) "impermissibly dilutes the Buckley standard” and therefore declared it unconstitutional. Since the first sentence of § 163-278.14A(a)(2) does not meet the criteria for being labeled "the functional equivalent of express advocacy,” as developed in McConnell and WRTL, this analysis has not changed.

. At the time this litigation commenced, § 163-278.6(14) further stated that an entity is "rebuttably presumed to have as a major purpose” the support or opposition of a candidate if it "contributes or expends or both contributes and expends during an election cycle more than three thousand dollars.” This monetary disbursement trigger has since been repealed by the North Carolina legisla *287 ture, so we do not consider it here. See N.C. Sess. Laws 2007-391.

. North Carolina directs this court to its discussion of Buckley in NCRL I. See Appellee Brief at 63. In that case, we stated that Buckley “defined political committee as including only those entities that have as a major purpose engaging in express advocacy in support of a candidate.” NCRL I, 168 F.3d at 712 (emphasis added and omitted).
The question of whether Buckley requires a state to show that an entity has "the ” or "a ” major purpose of influencing elections to be designated a "political committee” was not before the court in NCRL I, however. Our single use of the indefinite article was not intended to lay down a set of criteria or definition of political committee — an issue that only now is the subject of extensive briefing and argument before this court. This court’s explicit reservation, in NCRL II, of the question of "[wjhether an entity can have multiple major purposes” supports this point. NCRL II, 344 F.3d at 429. It would not have been possible for the panel in NCRL II to reserve the question of whether Buckley requires "a ” or "the ” major purpose if NCRL I had already decided the issue.
In the event, however, that the use of this one word created later confusion, we regret the miscommunication and acknowledge, as we did at the outset of this decision, our belief that North Carolina has proceeded in this matter in the best of faith.

. The plaintiffs ask us to adopt a brightline standard for determining whether “the major purpose” of an organization is the support or opposition of candidates. They argue that an entity should only fall within the ambit of “the major purpose” test if (1) the organic documents of the organization list electoral advocacy as the organization’s major purpose or (2) if the organization spends over 50% of its money on influencing elections. See Appellant Brief at 31-32. While this standard would be constitutional, we need not determine in this case whether it is the only manner in which North Carolina can apply the teachings of Buckley.

. North Carolina put forward, by way of new evidence, affidavits from Robert H. Hall and Thomas E. Mann, experts in campaign finance, and the draft chapter of a book on the influence of 527 Groups on elections. This new evidence largely supports arguments North Carolina made before this court in NCRL II: for example, that it is sometimes difficult for the State to distinguish independent from coordinated expenditures; that large donors may fund independent expenditure political committees; and that, at times, politicians react to the messages produced by independent expenditure political committees.
Importantly, however, North Carolina has failed to present the type of systematic and concrete evidence of corruption that led the Supreme Court to uphold contribution limits as applied to political parties in McConnell. Thus, North Carolina's evidence does not justify the remedy it seeks in this case: the ability to impose strict contribution limits on independent expenditure committees. The Supreme Court has not held such limits to be constitutional, and we will not do so here.
We need not ask if there will ever be a case in which North Carolina can present convincing evidence that contributions to independent expenditure committees are corruptive. Instead, we hold that the case for such limits was not made in NCRL II, nor was it made here.

. North Carolina also argues that NCRL-FIPE is not actually an independent expenditure committee because it is "closely intertwined” with NCRL and NCRL-PAC. See Appellee Brief at 37-43. However, while NCRL-FIPE does share staff and facilities with its sister and parent entities, it is independent as a matter of law. See North Carolina Right to Life, Inc. v. Lealte, 482 F.Supp.2d 686, 699 (E.D.N.C.2007).
Thus, North Carolina is, in essence, asking us to pierce the corporate veil. We decline to do so, particularly absent any evidence that the plaintiffs are abusing their legal forms or "any legal authority that considers [political committees] and their sponsoring corporation as identical entities.” Id.